**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PRESTON FEED CORPORATION, Respondent.**

No. 8555.

United States Court of Appeals Fourth Circuit.

Argued May 30, 1962.

Decided Oct. 5, 1962.

Melvin J. Welles, Attorney, National Labor Relations Board (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Peter M. Giesey, Attorney, National Labor Relations Board, on the brief), for petitioner.

William B. Devaney, Washington, D. C. (Charles V. Wehner, Kingwood, W. Va., and Steptoe & Johnson, Charleston, W. Va., on the brief), for respondent.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

The National Labor Relations Board found in this case that the employer had refused to bargain collectively with a labor union which represented a majority of its employees, had discharged one Donald Matthews because he was active in organizing the union at the plant, had abandoned certain trucking operations at its plant so as to furnish plausible excuse for the discharge and had engaged in other activities designed to restrain and coerce the employees in the exercise of their rights under the statute. The question for decision is whether there was evidence to support the Board's findings in these respects and whether the corrective remedies imposed by the Board were

justified. These include an order to the employer to cease and desist from discouraging membership in the union, from refusing to bargain collectively with the union, from interfering with the employees in the exercise of their rights, and affirmatively directing the employer to recognize and bargain with the union, to resume the transportation of its product by its own trucks, to reinstate striking employees to their former positions and to make them whole for loss of earnings in the manner hereinafter described.

Preston Feed Corporation operates a rendering plant at Reedsville, West Virginia, where it processes animal offal into certain meal products and tallow which it ships to points inside and outside the state. During 1961 the plant was operated in three shifts by eight laborers who worked in the plant and three truckmen who hauled the raw material from points in Pennsylvania and Maryland to the plant to be processed. Supervisory officers and employees were J. W. Ruby, President, A. D. Summers, Vice President, Kenneth Parks, Plant Manager, Frank O'Malley, Director of Industrial Relations, and Paul Zinn, Foreman of the second shift.

The company also operates a feed mill at Manheim, West Virginia, twenty-five miles distant from Reedsville, to which the greater part of its products are sent. The feed mill employs five or six workers but no truck drivers. Formerly, Preston Feed had bought all of its raw material from Sterling Processing Company, a corporation under the same management and control, and Sterling Processing then hauled the merchandise to Preston Feed's plant, but at the time of this case Preston did the hauling itself with three trucks and three drivers.

Evidence on behalf of the employer shows that in 1960 these trucking operations had been hindered by shortages and a large turnover of drivers and by accidents so that it frequently had to call on Sterling Processing for aid. In the fall of 1960 and in January 1961 the managers of Preston Feed concluded to abandon the hauling and turn it back to Sterling Processing. Certain memoranda or notes of these discussions were made and offered in evidence. In February 1961 the decision was made to transfer the trucking operations as soon as possible, delaying the change, however, for a short time so as to make it gradually as the drivers at Preston should quit their positions.

At this time there were three truck drivers in Preston Feed—Curtis White, Loren White and Donald Matthews. On February 27, 1961 Curtis White was severely injured in an off-duty automobile accident and was unable to continue his work. According to the employer's witnesses, it was then agreed amongst the managers of the company that the transfer of the trucking operations would be made as soon as possible and this decision was communicated to Sterling Processing, which suggested that it be postponed until March 6 because its drivers were all scheduled for the intervening week. This suggestion was adopted.

In the meantime a movement to unionize the plant had started in February 1961. It was initiated by truck driver Donald Matthews, who was recognized by the management as a useful man in the business. Having become dissatisfied with his wages, Matthews in mid-February approached Clifford Clemens, union business agent for the Teamsters' Local Union at Fairmont, West Virginia,* who instructed him what to do in organizing the union at the plant, and furnished him with union authorization cards. Matthews signed one and secured the signatures of Curtis White, one of the truck drivers, and of one McKinney, a laborer at the plant, who secured the signatures of six of the laborers, leaving only two of the eleven employees, Loren White—the third truck driver who refused to sign—and one other who was not solicited.

---

* The union involved is International Brotherhood of Teamsters, Chauffeurs, Warehousemen of America, Teamsters, Chauffeurs, Warehousemen & Helpers Local Union No. 789.

The management was not aware of the union activities until Saturday, March 4, and the truck drivers were not informed of the proposed transfer of truck operations until that day. Because of the injury to Curtis White the company had only two truck drivers at work during the week of February 27—Matthews and Loren White. The truck drivers were on a 40 hour week. Matthews had completed his quota by Thursday, March 2, but was told to report to work on the following Monday, March 6. Loren White, who had only accumulated 29 hours, continued to work Friday and Saturday. On Friday, March 3, Matthews went to the plant for his pay check and had a long talk with Manager Parks about changing working conditions of the truck drivers. Matthews said nothing to Parks about the union and Parks said nothing to Matthews about the proposed transfer of the trucking operations. On the contrary, he directed Matthews to come to work on the following Monday.

On the evening of Friday, March 3, the union mailed a letter to President Ruby of the company in care of the Sterling Faucet Company, at Morgantown, West Virginia, one of the enterprises affiliated with Preston Feed. Ruby was President of Preston Feed and all of the Sterling enterprises. The letter was received by Ruby on Saturday, March 4. Therein Clemens informed him that the employees had selected the union as their bargaining representative. The afternoon of the same day O'Malley, Director of Industrial Relations, notified Matthews that the company had made different arrangements for the hauling and had no further use for his services. Matthews notified Clemens and on Sunday, the following day, a meeting of employees was held which was attended by Matthews, Curtis White and six laborers, and it was unanimously decided to strike. On Monday, March 6, the company cancelled a trip by truck that Loren White had been instructed to make and told him there was some trouble at the plant and that he would be called back later.

During the day a conference between O'Malley, representing the company, and Clemens, representing the union, took place at which Clemens gave notice that the union represented the employees and that they would strike because Matthews, the chief union organizer, had been discharged and that they would stay out until the company agreed to reinstate him and keep the other employees in their jobs until some kind of election could be held. Clemens offered to agree to any method by which the union could demonstrate its representation of the men but O'Malley replied that it would take two or three days to decide upon the company's position. That afternoon a meeting was held between Clemens, Matthews and the employees and the men were told of the above interview and they decided to establish a picket line, and this was done before the second shift was due to come on at 3 P.M. In consequence the second shift was unable to start at the appointed time. That afternoon O'Malley visited the picket line and was told that the men would go back to work if he would reinstate Matthews and maintain conditions as they were until the union had an opportunity to prove its control. O'Malley refused and the strike continued.

The key question in the case is whether Matthews was discharged because of his union activities or because the company had decided to transfer its trucking operations to Sterling Processing Company and, therefore, had no further need for his services. In the consideration of this question before the Examiner and in this Court the company has emphasized the evidence on its behalf which shows that the transfer of the trucking operations had been decided, leaving only the date to be fixed, before the company had any information of Matthew's union activities; and that the accident to Curtis White led to the decision to make the change at once. On the other hand the General Counsel has relied on the evidence which shows that no notice of the contemplated change had been given to

the drivers or any employees until after the company had learned of the union's activities on Saturday morning, March 4, and that only then Matthews, who had previously been told to report to work on Monday, was discharged. Other evidence, tending to show that the decision to put the transfer into effect on Monday, March 6, was reached only after the company learned about the union, included the change in orders to Loren White on Monday, March 6, and the unexplained abandonment of the company's earlier suggestion that the change should be made gradually as the positions of truck drivers became vacant in the ordinary course of events.

■ The findings of the Examiner, which the Board adopted, were that the decision to transfer the trucking operations was precipitated and Matthews was discharged because of the union's letter demanding recognition and the desire of the company to discourage the employees' adherence to the union and undermine the union's status as bargaining representative; and that by this course of conduct the company had violated §§ 8(a) (3) and (1) of the Act, 29 U.S.C.A. § 158 (a) (1, 3). We are of the opinion that the evidence recited furnished substantial support for the conclusion that the company was guilty of unfair labor practices in its discharge of Matthews, and in hastily discontinuing its trucking operations on March 6. It cannot be said, however, that the decision to transfer the trucking operations at a convenient time was taken to frustrate or hinder the employees in their adherence to the union. The evidence that the transfer had been previously discussed and decided upon before the union activity began, and that the company was waiting only for an opportunity to put it into effect, is overwhelming. Moreover, the Examiner does not reject it. His position is that whether or not the transfer had been under previous consideration, there was no need to put it into immediate effect and it was hurriedly done on March 6 only after the Company knew that the union had succeeded in organizing the plant. With this

conclusion we agree and, coupling it with the discharge of Matthews, there is ample support for the finding of unfair labor practice on the part of the company.

■ The evidence also requires the conclusion that the company committed an unfair labor practice, in violation of §§ 8(a) (5) and (1), when it refused to bargain collectively with the union. It is not contended that the company did not in fact fail to bargain, but that the union did not ask for recognition. This position is insupportable. The union in its letter of March 3 notified the company that the employees had chosen it as their representative and expressly requested recognition. The company rejects this clear demand completely by referring to the conversation between Clemens and O'Malley on Monday, March 6. It is said that O'Malley at that time had no knowledge of the letter sent to President Ruby. However this may be, Clemens renewed his claim that the union represented the workers including the truck drivers, the laborers and the working foreman but that it would not insist on including the foreman in the union. Clemens then offered, in an effort to get an agreement, to submit to any method to prove the union's representative status but O'Malley asked for time to consider. The company construes this offer of Clemens as withdrawing the unqualified demand in its letter to the company and asking for an agreement to an election. Moreover, the company asserts that it had doubt as to whether the union represented a majority of the men.

Neither of these arguments is worthy of serious consideration. The demand for recognition in the letter was direct and unqualified. Clemens' attitude in the conference with O'Malley, and thereafter in leading the men to strike in the afternoon of the same day so that the company was obliged to suspend operations, fairly justifies the finding that he was continuing his definite demand for recognition. Furthermore, there is no question as to the company's knowledge of the union's representative status because it was well aware that its emloyees were in the pick-

et line protesting the company's discharge of Matthews. In N. L. R. B. v. Harris-Woodson Co., 4 Cir., 179 F.2d 720, 723, we said that it was a little short of absurd for an employer to express a doubt as to the representative status of a union when the majority of the employees had gone on strike under its guidance.

■ There is a suggestion also that the employees at the Reedsville plant did not constitute an appropriate bargaining unit because it did not include the employees at the company's plant at Manheim. In view of the fact that the Manheim plant was situated twenty-five miles from Reedsville, and that the two plants were under separate supervision, and that the classification of the employees and the wage rates differed, there is ample justification for the finding of the Board on the matter committed to its discretion that the employees at Reedsville in themselves constituted an appropriate bargaining unit. See N. L. R. B. v. Williams, 4 Cir., 195 F.2d 669, 671, cert. den., 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649.

■ The Board has found that the company in this case, in addition to its failure to bargain with the union, has committed other acts designed to restrain, coerce and interfere with its employees in the exercise of their rights in violation of § 8(a) (1) of the Act. On this account the Board has ordered the employer to cease and desist from such actions in the future. There is substantial testimony to the effect that the Vice President of the company photographed the strikers as they stood in the picket line, that a new employee by the name of Knotts was told that Matthews had been discharged because he belonged to the union, and that the union officials were racketeers and embezzlers of union funds, and that the new employee would be given a truck driver's job if the union movement failed, and that he should vote against the union in case an election was held. Another employee, Bohan, who had been absent during the week preceding the strike because of an injury and had not joined the union, was told, in effect, that the workers would be out of a job if

the union came in. These facts found by the Board, coupled with those relating to the discharge of Matthews, justify the finding that the workers had been interfered with in the exercise of their rights and the inclusion of a prohibition in the cease and desist order. See N. L. R. B. v. Dixie Shirt Co., 4 Cir., 176 F.2d 969, 973; N. L. R. B. v. Norfolk Southern Bus Corp., 4 Cir., 159 F.2d 516, 518.

Included in the Board's order for affirmative remedial action on the part of the company is the requirement that it offer to its eight laborers and three truck drivers reinstatement to their former or substantially equivalent positions and also make them whole for any losses caused by the company's refusal, if any, to reinstate them. To implement this provision it is required that the company resume trucking operations with its own employees and compensate them for loss of earnings in the following manner:

(a) The laborers who went on strike on March 6, 1961 are to be made whole for loss of wages from April 18, 1961 when they made an unconditional offer to come back to work, which the company refused, until May 4, 1961, when the company made an unconditional offer to take them back, which they refused.

(b) Donald Matthews is to be compensated for loss of earnings from March 4, when he was discharged, to May 4, when he refused reinstatement.

(c) Loren White is to be made whole for loss of earnings from March 6, when trucking operations were discontinued, and Curtis White, from the date he was physically able to return to work, to the date when the company shall reinstate them in obedience to the Board's order for affirmative action.

■ The power of the Board to order the reinstatement of unfair labor practice strikers and to compensate employees who have been improperly discharged for union activities is conferred by § 10(c) of the Act, 29 U.S.C.A. § 160(c). N. L. R. B. v. Jones and Laughlin, 301 U.S. 1, 47, 48, 57 S.Ct. 615, 81 L.Ed. 893. The same principle applies in this case to the

Whites who lost their positions by the unfair labor action of the company in transferring the trucking operations to discourage the establishment of the union.

The power of the Board to interfere in the business operations of an employer, as in this case, to compel the resumption of the truck driving operation which had been abandoned, is subject to strict limitation for it is not within the ordinary scope of the Board's authority to tell an employer how to run his business. The question has been considered in a number of cases in which the Board, in order to effectuate the purposes of the Act, has thought it desirable to require an employer to continue a certain business operation or department which he desired to abandon. In these cases it has been uniformly held that the Board is without power to interfere with management where the discontinuance of a part of the business is prompted by legitimate business motives and not in order to frustrate the purposes of the Act or interfere with employees in the exercise of the rights conferred upon them by the statute. See N. L. R. B. v. R. C. Mahon Co., 6 Cir., 269 F.2d 44; N. L. R. B. v. Houston Chronicle Publishing Co., 5 Cir,, 211 F.2d 848, 851; N. L. R. B. v. Missouri Transit Co., 8 Cir., 250 F.2d 261, 264; N. L. R. B. v. Jones & Laughlin, 301 U.S. 1, 43, 45, 57 S.Ct. 615, 81 L.Ed. 893; N. L. R. B. v. Brown-Dunkin Co., 10 Cir., 287 F.2d 17, 19; Williams Motor Co. v. N. L. R. B., 8 Cir., 128 F.2d 960, 964; N. L. R. B. v. Cape County Milling Co., 8 Cir., 140 F.2d 543.

In the instant case, as we have seen, the initial decision of the company to close its trucking department was based on economic reasons and not on hostility to the union, but the immediate decision and the prompt closing of the department on March 6th, when it was discovered that the employees led by the union were insisting upon their rights under the statute, was impelled by the intent to restrain the employees in their rights to collective bargaining. We shall, accordingly, enter a decree that the order of the Board in these and other particulars be enforced; but we wish to make it clear that, so far as the order to resume the operation of the trucking department is concerned, our decision is based on the closing of the department on March 6 and the order of the Board shall not be taken to deny the company the right to abandon the trucking operations at any time in the future if it deems best for business reasons to do so and is not impelled by the intent to deny to its employees the rights conferred by the statute.

The order of the Board will be enforced.

Enforced.