**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ASSOCIATED NAVAL ARCHITECTS, INC., Respondent.**

**No. 9910.**

United States Court of Appeals Fourth Circuit.

Argued Oct. 7, 1965.

Decided Jan. 20, 1966.

Albert V. Bryan, Circuit Judge, dissented.

Melvin Pollack, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Leo McGuire, Atty., N. L. R. B., on brief), for petitioner.

John A. MacKenzie, Portsmouth, Va. (Edgar A. Tugman, in pro per., on brief), for respondent.

Before SOBELOFF, BRYAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Circuit Judge:

The National Labor Relations Board adopted the finding of its trial examiner that Naval Architects, Inc., of Norfolk, Virginia, had committed unfair labor practices in violation of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(1), (3) (1958). It ordered the company to cease and desist from its unfair practices and to reinstate with back pay six machinists and machinists' helpers discharged at the height of the organizing campaign. We think the trial examiner's findings and recommendations are fairly and substantially supported in the record as a whole and that the Board's order is entitled to enforcement.

## I

Naval Architects operates a ship repair yard in Norfolk and ninety percent of its work is done for the Navy. During the summer of 1963 the company employed from 60 to 80 people, including the six complaining employees—machinists Parker, Tate, Jones, Brown, Teller and Paquin. When no machinists' work was available, the company's consistent practice was to assign the machinists to general maintenance and clean-up work around the yard. Thus, all six of these machinists had been continuously on the company payroll for up to two years prior to their discharge on Friday, June 14.

On June 1, 1963, the union [1] began an organizing drive with the distribution of handbills at the company's front gate. When informed of this activity, Edgar Everhart, the company's president, ordered pictures taken of the handbillers since, as he later testified, he was "curious to know what they look like." Superintendent Forbes took the pictures, in the presence of several company employees.

The first union meeting, held the next Friday, June 8, was attended by machinists Parker, Tate and Paquin, and machinist's helper Jones. The following Monday Supervisor L. C. Wade approached Parker and Tate and asked them if any of the Negroes under Wade's supervision had attended the meeting. Wade told Parker and Tate that he had given orders to the men under him not to attend any union meetings. He added that, if the organizing drive was successful, the men would be limited to doing the specific jobs for which they had been hired and would lose the benefit of the practice theretofore prevailing whereby machinists were assigned to other duties when machinists' work was unavailable. Another supervisor, Oliver, later made a similar approach to Parker and Tate. Like Wade, Oliver sought to obtain from the machinists details of the union meeting and repeated the admonition that the company practice of retaining machinists to do general work in the yard during slack periods between contracts would be terminated if the company was organized. Oliver also remarked to Parker that machinist's helper Jones, one of the alleged discriminatees here, seemed to be "tangled up with the Union," since Oliver had seen him talking to one of the union organizers.[2]

Once again, on Thursday night, June 13, a company representative contacted Parker in an effort to elicit information about the union's organizing drive. Superintendent Forbes telephoned Parker and particularly inquired "who was stirrin' it up with the colored people."[3] Parker disclaimed any knowledge, but Forbes insisted that he must be aware of what was going on from his close association with the men. Parker replied that he would not be a "white rat" on his fellow workers, but Forbes persisted, arguing that reporting the union's activities would not be "ratting" and that Parker should be "once for the company and always for the company." Forbes took the stand but did not refute Parker's testimony.

The next day, Friday, June 14, Supervisor Oliver again warned machinist Tate, as he had done earlier in the week, that if the union did come in, machinists would be retained solely to do machinists' work, and that some layoffs would result. The company at the time was engaged in overhauling eight LCVPs for the Navy, and no likelihood of immediate layoffs for lack of work appeared. In fact, five of the complainant machinists were asked to work overtime on Saturday to help get some of the boats out. About

---

1. United Industrial Workers of North America of the Seafarers' International Union of North America, Atlantic Gulf, Lakes and Inland Waters District, AFL-CIO.

2. Jones later arranged a private meeting of the Negro employees on discovering that they were afraid to attend open meetings.

3. Although Parker and Forbes had grown up in the same area, they had never associated socially and Forbes had never before called Parker.

1:30 that afternoon Foreman L. D. Wade asked Tate and Teller to work on Saturday; Paquin and Jones were likewise asked by Supervisor Oliver to work on Saturday and Sunday, transferring some piping. Machinist's helper Brown, also, was told by Supervisor McKee to report for work on Saturday.

However, at 4:30 that same afternoon all five men, and Parker, were suddenly laid off. Contrary to the company's normal practice, none of the men was given any advance warning.[4] Each was handed a slip furloughing him "[b]ecause of an unusually small workload" and told that he would be recalled "as soon as work is available."

## II

These activities of the employer, in their totality, were not innocuous. From them, the examiner was clearly justified in finding, and the Board in sustaining his finding, that the company had engaged in section 8(a)(1) unfair labor practices during the period immediately preceding the discharge of the machinists. The supervisors' efforts to have the machinists inform the company about fellow employees' activities in the organizing campaign, and the photographing of the handbilling in the presence of company employees, were plain violations of the Act, whether or not they were coercive in actual fact. See, e. g., N.L.R.B. v. Preston Feed Corp., 309 F.2d 346, 351 (4th Cir. 1962); N.L.R.B. v. May Department Stores Co., 154 F. 2d 533, 535 n. 2 (8th Cir.), cert. denied, 329 U.S. 725, 67 S.Ct. 72, 91 L.Ed. 627 (1946). The inquiry in N.L.R.B. v. Covington Motor Co., 344 F.2d 136 (4th Cir. 1965), concerning the signatures on membership cards which the union itself was ready to disclose, is of an entirely different order from the persistent interrogation of employees shown here to elicit information as to what happened at union meetings and the identity of the men who were active in the organizing campaign. It is idle to insist that not every conceivable inquiry is coercive, for we hold no more than that it was coercive in the present context.

The contention is made that the event which was witnessed could have been described orally, and that therefore a photograph is unobjectionable. But we have before us no question of the admissibility of a photograph; it is the act of photographing itself that had the tendency in these circumstances to intimidate.

Regarding the supervisors' repeated warnings that the machinists might be forced out of work in slack periods if the union came in, the company cites section 8(c) of the Act, which permits the expression of "any views, argument or opinion * * *" about a union, provided it "contains no threat of reprisal or force or promise of benefit." 29 U.S.C.A. § 158(c) (1958). But we think the examiner was warranted in his conclusion that this was more than a mere expression of opinion or colorless prophecy. See N.L.R.B. v. Stanton Enterprises, Inc., 351 F.2d 261, 264 (4th Cir. 1965). Within the context of an organizing campaign these remarks could well be regarded as improperly designed to discourage the machinists' participation by threatening loss of work. See, e. g., N.L.R.B. v. Lester Bros., Inc., 301 F.2d 62, 67 (4th Cir. 1962); N.L.R.B. v. Norfolk Southern Bus Corp., 159 F.2d 516, 518 (4th Cir. 1947).

## III

Replying to the allegations of discriminatory discharges, Mr. Everhart, the company's president, testified that he personally made the decision to lay off 14 employees, including the six complainants, after an early afternoon conference with Superintendent Forbes.[5] The lay-

---

4. President Everhart testified that it was the company's custom to give some advance notice.

5. Forbes, as previously noted, had been active in ferreting out those he considered the root of the union activity, the machinists; it was he who had taken the pictures of the initial handbilling and solicited machinist Parker to report on union activity among the employees.

offs, Everhart asserted, were dictated by the company's lack of work during the past several months, and he pointed out that four of the six complaining machinists were recalled on July 16 after the company received a new Navy contract.[6] The failure to recall Brown and Jones, Everhart insisted, was because no machinists' helpers were needed. While the company retained several men with less seniority than those discharged, Everhart's explanation was that one of these was a pipefitter, a classification in short supply, and that the other had been hired specifically to train for a supervisor's position. Similarly, Everhart justified the company's retention of ten summer college students on the ground that they were paid lower wages. Finally, he testified that the work remaining to be done in the yard consisted of general cleaning and finishing only, the machinists' work having been completed.

The trial examiner's report evidences that he fully considered this testimony tending to show some economic grounds justifying layoffs, but found from the timing and other circumstances, such as the sudden reversal of requests to machinists to work on Saturday, that the primary purpose and effect of the discharges was to discourage employee participation in union activities. Quite correctly he declared that if discouragement of union membership was a substantial, motivating reason for the layoffs, the existence of an alternate ground of justification would be no defense to a charge of employee discrimination under section 8(a)(3). The charge is sufficiently established if, in addition to an economic ground shown in the Labor Board hearing, there is proof from which the examiner may fairly find, as he did here, that the layoffs were motivated by a purpose to interfere with union organizational activities. See N.L.R.B. v. Georgia Rug Mill., 308 F.2d 89, 91–92 (5th Cir. 1962); N.L.R.B. v. Wells, Inc., 162 F.2d 457, 460 (9th Cir. 1947).[7]

Here, in combatting the union's attempt to organize its yard, Naval Architects focused on the machinists, thought to be the key figures in the union's effort, in the hope that pressure upon them would discourage other employees from joining the movement. Machinist's helper Jones had organized a private meeting of the Negro employees and was known by the company to be "mixed up with" the union; and Supervisor Forbes' unsuccessful effort to enlist machinist Parker as a company informer the night before the layoffs was perhaps the most striking, but not the only, example of the company's preoccupation with the machinists' role in the campaign. Finally, the company's economic justification fails to explain why it precipitously laid off the six machinists late Friday afternoon after five of them had been asked to work overtime on Saturday. This entire context forms a sufficient basis for the finding of discrimination violative of the Act.

## IV

Finally, the company complains of the examiner's denial of its motion for a bill of particulars specifying the persons, places and circumstances underlying the Board's charges. The charges were that on or about June 14—the day of the layoffs—company officials discriminated against the six named em-

---

6. The reduction in the work force from 80 to 60, cited by the company as justification for the dismissals on June 14, 1963, did not take place prior to the layoffs complained of, but occurred over a six-month period from June to January, following the layoffs.

7. The case before us is entirely different from N. L. R. B. v. United Brass Works, Inc., 287 F.2d 689 (4th Cir. 1961), where there was no evidence, other than the mere fact of union membership and the self-serving statement of the discharged employee, to refute the company's justification of the layoff. Here, to the contrary, the examiner could reasonably infer from the entire course of the employer's conduct that a design to discourage union membership played a substantial part in the layoffs.

ployees by interrogations, surveillance and the threat of economic reprisals. The Act requires only a plain statement of the charges, not a legalistic recitation of every particular fact to be proved, see N.L.R.B. v. Piqua Munising Wood Products Co., 109 F.2d 552, 557 (6th Cir. 1940). There is no reason to doubt that Naval Architects was sufficiently informed of the charges against it and the issues to be resolved at the hearing. No more was necessary.

The order will be

Enforced.

ALBERT V. BRYAN, Circuit Judge (dissenting).

The trial examiner's ultimate finding, adopted by the Board, of the employer's discrimination in the layoff of six employees is squarely opposed to his subsidiary findings. Despite the Company's effort to retain its employees by assigning them to work "outside of their trade," "work had become slack" by early May and, because of the "lean" work load, these men were temporarily laid off on June 14, 1963. The truth of this explanation for reducing the work force was explicitly found by the examiner, thus:

"Respondent's evidence *established* that its failure to bid successfully had resulted in the small workload which it assigned in the layoff notices and that, accordingly, *there existed a sound economic basis for a temporary reduction in force.* It showed further that the work force had varied in the past according to the workload, though it had made no layoff for some 2 years and had retained its staff during that period through the expedient of assigning temporarily unneeded employees to doing maintenance, laboring, or other 'make work,' outside of their job classifications. Despite the latter facts, Respondent was free, of course, absent discriminatory motivation, to discontinue at any time the carrying of surplus employees." [Accent added.]

But thereafter the examiner prefers to impute an ulterior motive to the releases, rather than to accord a presumption or draw an inference of fair play by the employer. This approach is persisted in notwithstanding the emphatic contrary mandate of this court to the Board in N.L.R.B. v. United Brass Works, Inc., 287 F.2d 689, 693 (4 Cir. 1961), Judge Boreman there saying for us:

"That York [the employee] was a union member and an active movant in the organizational drive will not shield him from release for good cause. * * * If discrimination may be inferred from mere participation in union organization and activity followed by a discharge, *that inference disappears when a reasonable explanation is presented to show that it was not a discharge for union membership.*" [Emphasis added.]

If the examiner is to prevail in his resistance to our holding, there should at least be substantial evidence to impugn the employer's motive, and there be "established," contrary to his first conclusion, that the discharge was because of union activity. The evidence relied on by the examiner to support his finding that sections 8(a)(1) and (3) had been violated can hardly be said to be of such substance.

To account for his final decision the examiner relied upon "the immediate background of * * * [the employer's] coercive conduct." Presumably, this includes a picture taken of the distribution of pro-union leaflets and the remarks enumerated in the majority opinion of certain supervisors to the employees.

With the exception of Wade's inquiry about the Negroes under his supervision, the other statements by management personnel consisted of conversations in the intimacy of friends and wholly without any semblance of "coercion." The photograph was genuine and truthful. It was taken to be sent to the employer's president, then in California, to apprise him of the union's campaign. It was no more than a recording of an event which was

likewise photographed in the eye and mind of all observers. How the reproduction of it on a film constitutes such a horrible, I cannot understand.

The "warnings" which the opinion of the court ascribes to Oliver consisted of his conversations with Parker and Tate. The three were all former Navy enlisted men and frequently discussed this mutual interest. On one or two occasions Oliver observed that the entry of a union would mean that the machinists would lose the benefit of being assigned to other jobs when machinists' work was unavailable. Equally innocuous, it seems to me, was Oliver's question of what had happened at the union meetings.

Superintendent Forbes is said to have engaged in an unfair labor practice in telephoning Parker to ask "who was stirrin' it up with the colored people". Parker declined to answer, as he had a right to do, but this did not prove the question coercive. But "background" is here relevant also. It was not a cold, official inquiry by a supervisor to a subordinate. Forbes and Parker, though not social companions, had common native heaths and mutual friends. At one time Parker had asked Forbes' advice about getting another job. It was Forbes who had originally employed him and later reemployed him. Forbes also had employed Parker's friend Tate on the recommendation of Parker. Surely there was no austerity or "pull of rank" to raise Forbes' inquiry to the level of coercion.

These facts are weak reeds indeed for the examiner's verdict of section 8(a)(1) and (3) violations. More incomprehensible is his use of them to dissolve his own previous finding that the employer's explanation was truthful and "established". That even more pointed interrogation is unexceptionable and clearly permitted by section 8(c), we held in N.L. R.B. v. Covington Motor Co., 344 F.2d 136, 137 (4 Cir. 1965). The implication of the majority is that any specific inquiry whatsoever by an employer to an employee concerning the union's organizational activities is impermissibly coercive and forbidden. This view I cannot accept in the face of section 8(c).

Only bare recognition, moreover, is given by the examiner of the undisputed fact that the men were laid off "strictly in order of seniority" and that eight others were also released at the same time. Nor is it mentioned that all of the employees now in suit were only "furloughed" and were told at the time that they would be recalled "as soon as work is available". Nor that faithful to this representation, letters were sent by the employer on July 11, to the five machinists here to return to work. The sixth "discriminatee", Jones, a machinist's helper, was not recalled because helpers were not needed and none have been hired since June 14. Particularly worthy of mention, but left unmentioned, is the fact that the Company's work force has been steadily reduced since June 14. The testimony indicated that after these layoffs the drop continued—from "approximately 80" in June 1963 to "a little under 60" in January 1964. This circumstance—a twenty-five percent reduction in work force over a six-month period—certainly confirms the Company's justification of the dismissals as a part of a general pattern, not a device designed to punish the six employees.

The employment and retention of 10 college boys for the summer is noted by the majority as indicating there was no economic reason for the layoffs. The examiner did not rely on this circumstance, and rightly so, because the boys were not machinists or machinist's helpers but only "general helpers and laborers". Furthermore, they were paid $1.25 as compared to a machinist's pay of $2 to $2.40 per hour.

In sum, I think the substantial evidence in this case warrants no finding by the examiner and the Board except that Wade's conduct was a section 8(a)(1) violation.