**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**McCORMICK CONCRETE COMPANY OF S. C., INC., Respondent.**

**No. 10576.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 1, 1966.

Decided Jan. 10, 1967.

Charles N. Steele, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and George B. Driesen, Atty., N. L. R. B., on brief), for petitioner.

Wm. H. Smith, Jr., Columbia, S. C. (Ellison D. Smith, Jr., Columbia, S. C., on brief), for respondent.

Before BOREMAN, J. SPENCER BELL and CRAVEN, Circuit Judges.

BOREMAN, Circuit Judge.

National Labor Relations Board (hereafter Board) petitions for enforcement of its order directing McCormick Concrete Co. (hereafter company) to cease and desist from unfair labor practices in violation of sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act and to reinstate two discharged employees to their former positions with back pay. We conclude that there was substantial evidence on the whole record to support the Board's findings and that the order should be enforced.

The company, located at Conway, South Carolina, is engaged in the manufacture of concrete blocks and ready-mix cement for sale to construction companies. At the time of the alleged violations there were fifteen production employees, a superintendent, Thomas, and the president and owner, Conway.

The International Union of Operating Engineers, Local 497, AFL–CIO, began an organizational drive among the company's employees in late May or early June 1964. It was in relation to these activities that the Examiner and the Board held that the company violated section 8(a) (1) of the Act by interrogating employees about the union, soliciting employees to help the company stop the union, making disparaging remarks about the union, and threatening eco-

nomic reprisals for those employees who joined the union. The company was also found to have violated section 8(a) (3) of the Act by discharging employees Lambert and Richardson for their participation in the union organizational campaign.[1]

The company's assertions that it did not engage in any activities in violation of section 8(a) (1) consist, in the main, of blanket denials of such activities. The company attempted to explain that the discharge of employees Lambert and Richardson was due to their disinterest and incompetence as workers rather than because of their participation in the union activities. The company also argues that Lambert exercised supervisory powers and was, therefore, not an employee within the meaning of section 2(11) of the Act.

■ Aside from the legal question of Lambert's employee status we are presented here with conclusions of the Board which rest entirely on the resolution of issues of credibility. Our power of review in such instances is limited by section 10(e) and (f) to determining whether or not there is substantial evidence on the whole record to sustain the Board's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951).

The section 8(a) (1) violations fall into several categories.

### Interrogation

It was found that Thomas, the superintendent, had interrogated the employees Lambert, Richardson and Rice as to what they knew of the union and that Rice was also questioned by Conway as to whether or not his signature on an authorization card was authentic.

■ Each of these employees testified that he had been interrogated by Thomas as to whether a union was organizing the employees and as to his participation. Thomas admitted asking Lambert if he knew about the union but denied asking Lambert any other questions. He denied speaking to either Rice or Richardson about the union. The Examiner who had an opportunity to observe the demeanor of Thomas found that his attitude was "belligerent and not such as to inspire confidence." In view of positive testimony that these interrogations took place and the fact that there was a finding of belligerent demeanor on the part of Thomas, there is substantial evidence to support the Board's conclusion that the employee interrogations did take place.

Rice testified that he was also interrogated by Conway who showed him (Rice) a copy of a union card and asked if the signature thereon was his (Rice's). When Rice replied that it was his signature, Conway stated that he was checking the authenticity of the signatures. Conway admitted that he questioned Rice about his signature but argues that such interrogation—unaccompanied by any threats or hostility—is permitted by the Board's decision in Blue Flash Express, 109 NLRB 591. This case merely holds that interrogation per se, unaccompanied by any threats, is not a violation of section 8(a) (1) but may become such depending on the manner in which it is done and the surrounding circumstances. See Daniel Constr. Co. v. NLRB, 341 F.2d 805 (4 Cir. 1965); NLRB v. Zimmox Coal Co., 336 F.2d 516 (6 Cir. 1964). The Board's finding that this interrogation was a violation of section 8(a) (1), considered in the context of previous interrogations of Rice and the other employees, threats, company attempts to secure employee assistance to stop the union campaign, and the fact that no assurance was made that there would be no reprisals is supported by substantial evidence.

### Soliciting Employees to Help Stop the Union

■ Employees Lambert and Richardson testified that Thomas sought their

---

1. The Trial Examiner held that a third employee, Wilson, was discharged for union activity but the Board found that Wilson was discharged because his driver's license had been revoked and he no longer could perform his job as a truck driver.

assistance in the company's effort to stop the employees from joining the union and that Thomas wanted them (Lambert and Richardson) to supply the names of the employees in the union. Thomas denied *any conversation* with these employees on this subject. But there was ample evidence to support the Board's conclusion that such solicitations were made and they are clear violations of the Act. See NLRB v. Associated Naval Architects, 355 F.2d 788, 791 (4 Cir. 1966). Here again the Examiner stated that because of Thomas' belligerent demeanor if there were a conflict between his testimony and that of the employees the Examiner would credit the latter.

## Threats and Coercion and Derogatory Remarks

█ It was found that Thomas made the following threats of economic reprisal: (1) Thomas told Lambert that he (Lambert) and others would lose their jobs because of the union; (2) Thomas told Richardson that the union would not do him any good; (3) Wilson was informed by Thomas that if the latter continued to "mess" with the union he would not be permitted to learn how to operate the crane, and subsequently Wilson was told by Thomas that it would be better for him if he tore off his union button and "straightened up"; (4) Thomas made statements to Cuttino, an employee, that he (Cuttino) should not participate in the union, that the union would do him no good and in the event the union became their bargaining agent the truck drivers would not be given yard work when they were not driving; (5) Thomas told Rice that the union would do him no good. Lambert and Richardson also stated that Thomas told them that the union was "communist" and "no good." All of the employees involved testified that Thomas made the above-listed threats and warnings all of which Thomas categorically denied. The Examiner chose to believe the employees and stated that Thomas' belligerent demeanor did not render his testimony credible.

The company also argues that even if Thomas made such statements they were no more than mere expressions of opinion as to what would follow upon union recognition. The fact that these statements considered alone and out of the context in which they were made may not amount to threats of economic reprisal is of no moment because their effect must be considered in toto. As Judge Learned Hand observed in a similar situation,

"* * * Arguments by an employer directed to his employees have such an ambivalent character; they are legitimate enough as such, and pro tonto the privilege of 'free speech' protects them; but, so far as they also disclose his wishes, as they generally do, they have a force independent of persuasion. The Board is vested with power to measure these two factors against each other, * * *. Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used, of which the relation between the speaker and the hearer is perhaps the most important part. What to an outsider will be no more than the vigorous presentation of a conviction, to an employee may be the manifestation of a determination which it is not safe to thwart. The Board must decide how far the second aspect obliterates the first." NLRB v. Federbush Co., 121 F.2d 954, 957 (2 Cir. 1941).

█ Clearly, here it is for the Board to decide whether particular expressions amount to threats of economic reprisal and coercion. NLRB v. Stanton Enterprises, Inc., 351 F.2d 261 (4 Cir. 1965); Daniel Constr. Co. v. NLRB, 341 F.2d 805 (4 Cir. 1965).

█ The company also argues that section 8(c) which permits the statement of "any view, argument or opinion if it contains no threat of reprisal or force or promise of benefit" protects the statements made. This circuit has held that within the context of an organizing cam-

paign remarks of this nature could easily be taken as an intention to discourage acceptance of the union by threatening loss of work notwithstanding the proviso of section 8(c). NLRB v. Stanton Enterprises, Inc., supra at 264; NLRB v. Associated Naval Architects, Inc., supra, 355 F.2d at 791. The Board was justified in concluding that Thomas' statements were coercive when considered in the context in which they were made.

The Board found that the company violated sections 8(a) (3) and 8(a) (1) of the Act by discharging employees Lambert and Richardson. Lambert testified that on June 17 he had three conversations with Thomas in which Thomas, in addition to making threats of economic reprisal, implored him to assist the company in stopping the union and to disclose the names of the union members: and that he was given a check and told by Thomas that there was no work for him the remainder of the week. Lambert stated that he said to Thomas that the reason he was being fired was because of the union and Thomas said nothing but nodded his head in the affirmative. Thomas denied that this conversation took place and defended the discharge of Lambert on the ground that his work had fallen off and that he no longer seemed to be interested in his job.

Richardson testified that he was discharged on June 26, 1964, nine days after Thomas spoke to him about his union activities and made statements concerning economic reprisals. The company claimed Richardson's discharge was due to his poor attitude as a worker and his failure to heed several warnings issued in this regard. Richardson, however, denied that he was ever told that his work was unsatisfactory.

■ Here again we are confronted with credibility issues. We cannot say that the Board's finding that these discharges were discriminatory was bereft of substantial evidence. This finding is buttressed by the "coincidence" of interrogations, threats and efforts to have employees aid the company to defeat the union.

The company also raises an additional issue in defense of the section 8(a) (3) violations. It argues that Lambert was not an employee but was rather a supervisor and is therefore excluded from the protection of the Act by section 2(3). Section 2(3) excludes supervisors as defined by section 2(11) which states:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

Lambert was examined and interrogated in light of the language of the statute. He denied (1) being told that he had the authority to do any of the acts specified in the statute, (2) exercising any such power, and (3) making any recommendations as to such acts. On the other hand, the company asserts that Lambert was a salaried employee, that he directed the block-making activity and that he could make hiring and firing recommendations which were accorded some weight.

■ In view of Lambert's categorical and detailed denial that he was authorized to act as supervisor or that he in fact did operate as supervisor, we think the Board was warranted in concluding that Lambert was an employee and not a supervisor. It appears that even if the company's testimony were accepted Lambert was engaged in little more than the routine duty of keeping the block machine operating. Northern Virginia Steel Corp. v. NLRB, 300 F.2d 168, 170–172 (4 Cir. 1962); Precision Fabricators v. NLRB, 204 F.2d 567 (2 Cir. 1953); see Tele-Trip Co. v. NLRB, 340 F.2d 575 (4 Cir. 1965); NLRB v. North Carolina Granite Corp., 201 F.2d 469 (4 Cir. 1953).

Enforcement granted.