350 So.2d 819 (1977)
SCHOOL BOARD OF ESCAMBIA COUNTY Florida, Petitioner,
v.
The PUBLIC EMPLOYEES RELATIONS COMMISSION and the Escambia Education Association, Respondents.
No. CC-245.
District Court of Appeal of Florida, First District.
October 14, 1977.
*820 Michael W. Casey, III, of Muller & Mintz, Miami, Louis F. Ray, Jr., Pensacola, for petitioner.
Curtis L. Mack, Gerald A. Williams, and Thomas W. Brooks, Tallahassee, Richard H. Frank and John J. Chamblee, Jr., of Frank & Meyer, Tampa, for respondents.
MILLS, Acting Chief Judge.
Petitioner, School Board of Escambia County, Florida (Board), seeks review of an order of the respondent, Public Employees Relations Commission (PERC), which found that the Board had engaged in unfair labor practices in violation of Section 447.501(1)(a) and (c), Florida Statutes (Supp. 1974), by (1) engaging in surface bargaining, (2) photographing lawful union activities, and (3) refusing to bargain in good faith on dues deductions and threatening its employees with one lump sum dues deduction. PERC ordered the Board to cease and desist from its unfair labor practices and to reinstitute dues deductions at the cost of five cents per card per month. The Board contends that PERC erred in finding that the Board had engaged in unfair labor practices. We will address each finding separately.

FAILING TO BARGAIN IN GOOD FAITH BY "SURFACE BARGAINING".
On 22 April 1975, the respondent, Escambia Education Association (EEA), was designated as exclusive collective bargaining representative for a unit consisting primarily of teachers. On 23 April, the EEA and the Board met formally for the first time and EEA presented a proposed contract of 123 pages. Meetings of 13 and 20 May produced an agreement on the recognition article and interim dues deductions. No bargaining was conducted from 20 May until 1 July due to the actions of the Board. During that period of time, the EEA placed over twenty-two phone calls to the Board's agents and the chief negotiator's associates requesting that the chief negotiator (Dr. Moses) return the calls. Subsequent bargaining sessions were also hindered by the Board's actions. Although the parties had agreed to certain negotiating guidelines, the Board chose to ignore some of the guidelines and required that certain procedures not included in the guidelines be followed. During the period from 1 July to 23 July, it was found that the Board was unprepared for approximately seven of the nine meetings and late to four of the meetings. The EEA declared a statutory impasse on 23 July.
At the 1 July meeting, the Board announced that it considered a significant majority of the items in the EEA's proposed contract to be nonbargainable. These included school calendars, class size, lunch duty, promotion and transfer procedures, dismissal and layoff procedures, teachers' aides, extra time for extra duties, and filling of vacancies. At no time during the course of negotiations prior to impasse did the Board waiver in its definition of non-negotiability, nor did it offer to bargain about the effects of its "non-negotiable" policies on the members of the unit. The Board also insisted that all proposals were part of a total "package" and could only be accepted or rejected along with the rest of the *821 package. During the July sessions, the Board submitted language on grievance procedures which was accepted by the EEA, and representatives of both the EEA and the Board initialed the proposal. The EEA presented proposals on sabbatical and military leave that were accepted by the Board; however, Dr. Moses would not sign or tentatively agree to those sections because to do so would "break his package". The Board refused to formally agree to its own counterproposals on retirement and insurance during maternity leave because of its package concept.
After statutory impasse was declared, the parties met with a mediator approximately five times from 13 August through 26 September. At the first meeting, the Board's team was approximately two hours late (Dr. Moses never arrived), and was not prepared. The mediator therefore adjourned the session almost immediately. Dr. Moses also did not show up for a mediation session scheduled on 23 September. On the morning of 26 September, the Board presented a proposal touching on all issues it considered negotiable. The EEA was unable to accept the package and declared itself ready to go to the special master.
Between 26 September and 30 October, two special masters recused themselves as prejudiced by ex parte communications received from the Board. At the 23 October meeting, the EEA presented a significantly reworked proposal which included identical language from nine of the Board's last proposals; however, Dr. Moses refused to tentatively agree to those sections because he would not "break his package" and again placed the 26 September proposal back on the table and refused to modify it.
At the beginning of November, EEA attempted to schedule two meetings with the Board. The Board did not appear at either meeting. The parties agreed to a marathon bargaining session from 28 November to 30 November. Agreement was tentatively reached subject to ratification by the Board and the employees in the bargaining unit. The Board approved the contract, but it was rejected by the employees. In the tentative agreement, salary was reduced by 3.6 percent and none of the items the Board considered non-negotiable were mentioned, such as: dismissal of employees, layoff, tenure, evaluation, scheduling of planning period, and class size, among others.
PERC concluded that whether an employer has bargained in good faith must be determined by the totality of the circumstances rather than single acts standing alone. PERC found that the Board's stance throughout negotiations that certain major issues were non-negotiable, its insistance on a "total package agreement", its failure to attend scheduled meetings and habitual lateness, and its failure to provide the EEA with relevant information, were inconsistent with the Board's duty to bargain in good faith. PERC therefore concluded that the Board had violated Section 447.501(1)(c). We agree.
The Board asserts that this matter is merely one of "hard bargaining". It points out that the EEA could not bring pressure upon the Board to make concessions because the EEA could not strike, and argues that it is not surprising that the Board used this "power advantage" at the bargaining table. We do not believe that the constitutional and legislative prohibitions against strikes by public employees were ever intended to give public employers a power advantage over their employees in contract negotiations. Strikes are prohibited to protect the public, not to circumvent the rights of public employees to meaningful collective bargaining with their employer.

PHOTOGRAPHIC SURVEILLANCE.
For a period of two or three days in August, members of the EEA picketed the Board's central office building after having obtained a parade permit from the City of Pensacola. When the picketing began, the Board's Director of Employee Relations directed that photographs of the picketing be taken. Two photographers took pictures that were given to the Director who testified that the photos were taken for a historical record he was compiling on labor relations. *822 An assistant principal, a member of the Board's bargaining team, stated that an additional reason for taking the pictures was to determine whether the picketers were violating the law. The picketers testified that the presence of the photographers increased their apprehension of reprisals from the Board for their picketing activity. The hearing officer found that the Board made no attempt to utilize the photos for retaliation.
PERC concluded that the photographic surveillance of the pickets was coercive and violated the employees' rights to engage in union activities, and therefore was an unfair labor practice within the meaning of Section 447.501(1)(a). We agree.
Although Florida courts have not addressed this issue, there have been numerous cases which have held such photographic activity to be an unfair labor practice under the National Labor Relations Act. N.L.R.B. v. Associated Naval Architects, 355 F.2d 788 (4th Cir.1966); N.L.R.B. v. Rybold Heater Co., 408 F.2d 888 (6th Cir.1969); N.L.R.B. v. Preston Feed Corporation, 309 F.2d 346 (4th Cir.1962); Radio Industries, Inc., 101 N.L.R.B. 912 (1952). The exceptions have been where employers have taken photographs to be used as evidence in court proceedings. Larand Leisurelies, Inc. v. N.L.R.B., 523 F.2d 814 (6th Cir.1975); Hilton Mobile Homes, 155 N.L.R.B. 873 (1965). In National Spinning Co., Inc., 174 N.L.R.B. 379 (1969), photographs were taken to provide evidence of violations of an existing injunction. The photographs were not taken to determine whether a violation had occurred, but were taken to prove that a violation had occurred. This distinction was recognized in Radio Industries, Inc., supra. In that case pictures were taken of union picketing and leaflet distribution activities in front of the plant. As justification for the photographs, the employer pointed to injunction proceedings which it had brought and its need for evidence that the union activities were not peaceful. The NLRB found that while there was justification for taking pictures of actual incidents, pictures taken of totally peaceful situations could not be justified.
In this case the Board's asserted purposes for taking the photographs are not sufficient to justify its actions. Employees engaged in lawful union activities have a right to be free from intimidation and coercion. The fact that the photos were not actually used to retaliate against those employees who picketed does not prevent the action from being an unfair labor practice. It is the act of photographing itself which tends to intimidate and restrain, and, therefore, the act of photographing is the unfair labor practice. N.L.R.B. v. Associated Naval Architects, supra.

DUES DEDUCTIONS.
On 20 May, the EEA and the Board met and worked out an interim agreement concerning dues deductions for the remainder of the 1974-75 school year (June, July and August). The agreement provided that dues would be deducted monthly by the Board and the EEA would pay the Board $325.00 as the cost of dues deductions for the three-month period. On 15 July, at a negotiating session, the issue of the cost of dues deduction for the following school year was brought up. The Board proposed that the EEA pay the Board $12,500.00 annually for the costs of processing the dues deductions. On 16 July, EEA suggested a counter-proposal on dues deductions, whereupon the Board's bargaining team caucused for five hours and then returned to the table with a proposal which retained the $12,500.00 cost, permitted deductions without annual card resubmission, and mandated a lump sum deduction of dues from the teacher's first paycheck. The Board's subsequent proposals provided for only minimal decreases from the $12,500.00 figure, and one proposal presented a potential increase in cost to EEA (50 cents per month per deduction  a cost of $15,000.00 if all unit members authorized deductions).
When the teachers returned for the 1975-76 school year, no agreement had been reached regarding dues deductions. The Board had stopped deducting dues at the *823 end of August, the last month covered by the interim agreement, and refused to resume the withholding of dues in the absence of a valid collective bargaining agreement. The Board further refused to consider executing a separate agreement regarding dues deductions, saying it was unwilling "to break its package" at the table.
For the previous six years, the Board had deducted monthly dues for the EEA based on the annual re-execution of authorization cards by employees; however, the Board refused to follow this practice and dues were not withheld from the paychecks of those members who executed annual dues authorization cards.
On 2 October, the Board sent a memo to all teachers indicating that the entire amount of annual dues would be deducted in one lump sum payment unless the member withdrew his dues authorization card. After the release of the memo, several teachers withdrew their authorization cards and a substantial number of teachers withdrew from the EEA. No lump sum deductions from the October paychecks were made by the Board.
At the end of September, the parties had agreed to a figure of $1,300.00 as the cost for dues deductions for the entire year (five cents per card per month) and this was incorporated into the tentative agreement reached at the end of November which was ratified by the Board but rejected by the employees in the unit.
PERC found that by refusing to bargain in good faith on dues deductions and by threatening its employees with one lump sum deduction, the Board had engaged in unfair labor practices within the meaning of Sections 447.501(1)(a) and (c).
According to PERC's final order, the Board was not charged with failing to bargain in good faith on dues deductions or with threatening its employees by promulgating the 2 October memorandum. The complaint only alleged that the Board refused to deduct dues as required by Section 447.303, Florida Statutes (Supp. 1974), thereby violating Section 447.501(1)(a). However, since the Board does not assert that the variance between the charge and the finding was error, we will not address that issue.
We agree with PERC that the Board failed to bargain in good faith on dues deductions, and that under the circumstances of this case, the memorandum on dues deductions violated Section 447.501(1)(a).
Having found the Board guilty of unfair labor practices, PERC ordered the Board to begin deducting dues from the salaries of EEA members who authorize the deductions "... at a cost to the Association which the parties herein have twice found to be reasonable, i.e., five cents per card per month, until such time as changed circumstances mandate a renegotiation of the reasonable cost of dues deductions." The Board argues that PERC erred as a matter of law in ordering the Board to implement dues deductions in the absence of a collective bargaining contract, contending that Section 447.303 only requires dues to be deducted during the term of a collective bargaining agreement. This issue is now moot. In 1977 the legislature amended Section 447.303, and it is now perfectly clear that dues deductions shall commence upon written request and shall be in force as long as the organization remains the certified bargaining agent for the employees. Chapter 77-343, § 10, Laws of Florida. Section 447.503(4)(a), Florida Statutes (Supp. 1974) provides that if PERC finds that an unfair labor practice has been committed, it shall issue an order "... requiring the respondent party to cease and desist from the unfair labor practice and to take such positive action, including reinstatement of employees with or without back pay, as will effectuate the policies of this part." In this case, the Commission ordered the Board to take the positive action of instituting dues deductions at a cost which the Board had previously agreed was reasonable. Under Section 447.503(4)(a), PERC had the authority to issue such an order.
The Board also urges that the hearing officer abused his discretion in failing to *824 grant a continuance to the Board on the third day of the unfair labor practices hearing. We do not agree.
We affirm the order of PERC.
SMITH and ERVIN, JJ., concur.