353 So.2d 1244 (1978)
DUVAL COUNTY SCHOOL BOARD, Petitioner,
v.
FLORIDA PUBLIC EMPLOYEES RELATIONS COMMISSION and Duval Teachers United, FEA-AFT, AFL-CIO, Respondents.
No. FF-489.
District Court of Appeal of Florida, First District.
January 11, 1978.
*1245 Dawson A. McQuaig, Frederick J. Simpson and William Lee Allen, Jacksonville, for petitioner.
Jane Rigler, Tallahassee, Anne M. Parker, Miami, William Powers, Tallahassee and Leonard A. Carson, North Miami, William H. Maness, Jacksonville, for respondents.
MILLS, Acting Chief Judge.
Petitioner, Duval County School Board (Board), seeks review of an order of the Public Employees Relations Commission (PERC) finding that the Board had committed an unfair labor practice in violation of Section 447.501(1)(a) and (c), Florida Statutes (1975).
The complaint issued by the Acting General Counsel of PERC alleged that the Board had refused to bargain collectively in good faith by engaging in surface bargaining which included, but was not limited to, the following acts:
(1) insisting throughout the course of negotiations that certain "mandatory subjects of bargaining", such as employee transfer, discipline and discharge, seniority, teacher preparations, sick leave bank, class size, summer school assignment, field trips, disruptive student policy, student discipline and attendance registers, were not negotiable and refusing to bargain on these issues;
(2) releasing to the press a salary proposal which had never been submitted to the Duval Teachers United (DTU) at the bargaining table; and
(3) stating, through its negotiator, that teachers had lost a 6.25% raise because their union forced negotiations to an impasse.
The Board answered the complaint by denying the allegations and asserting various affirmative defenses directed to its refusal to negotiate on the subjects termed "mandatory subjects of bargaining". The case was tried before a hearing officer, a recommended order was issued, and exceptions to the recommended order were filed by the Board. After considering the record, briefs, and oral arguments, PERC entered its amended order finding the Board *1246 guilty of violating Section 447.501(1)(a) and (c).
The parties met on 22 April 1976 to begin collective bargaining. A few days before the meeting Superintendent Sang had publicly attacked Bates, the union's chief negotiator, as an "outside agitator and hired gun" and accused the DTU of "coming to the table to pick the pockets of the taxpayers". At the first session Bates referred to the statement and mentioned that both sides should refrain from making such attacks in the future because mutual trust was essential to the negotiation process. Negotiations then commenced with a discussion of ground rules.
The first ground rule proposed was: "Each negotiating session shall be scheduled at a mutually agreeable date, time and place which shall be determined at each preceding session." Bates expressed reservations about daily scheduling because of another commitment to negotiate an agreement in St. Louis, Missouri, but finally agreed with the proposed scheduling rule. The parties agreed to meet on 28, 29 and 30 April.
On 28 April the language of the ground rules was finalized. Although approximately 80% of the DTU proposals had been submitted by that date, the Board's chief negotiator, Andrew Knight, refused to bargain on those proposals until 10 May because the ground rules stated that the parties' final proposals were to be submitted by 10 May and all of the DTU's proposals had not been submitted.
DTU submitted its remaining proposals on 10 May; the Board submitted five proposals to DTU on 11 May. At the 12 May meeting, the Board stated that the five proposals constituted its entire response to DTU's package. At this meeting the parties agreed to the Purpose and Agreement clauses submitted by the Board and placed proposals on the agenda (including Discipline and Discharge, Tenure, Personnel Files, Reprimand or Criticism, Grade Reporting, Personal Rights, Academic Freedom and Transfer) for the following day.
On 13 May DTU attempted to negotiate on Discipline and Discharge, Personal Rights, Academic Freedom and Transfer but was informed that these subjects were "inherent management rights" and non-negotiable. The Board's counter-proposals on the other agenda items tracked the language of the previous year's contract. Bates tried to set a calendar for future sessions, reminding the Board of negotiations in St. Louis, but Knight refused because the ground rules stated that scheduling must be determined at the preceding meeting. Bates attempted to secure a commitment that the Board would meet on Saturday, 15 May, since Bates had a plane reservation for 14 May that he would cancel if negotiations could be held on Saturday. Knight responded that it would "probably be okay" but that he couldn't make a firm commitment until Friday because the ground rules precluded such a commitment. The parties agreed to meet on Friday, 14 May.
Near the close of the 14 May meeting, the Board declined to meet on Saturday, 15 May. It was then too late for Bates to depart on his scheduled flight. The next session was held on 19 May.
During the preceding meetings, the attempts by DTU to place those items labeled "non-negotiable" by the Board on the agenda were frustrated by the Board's insistence that the agenda had to be "mutually agreed to". The ground rule stated: "Agendas for each session shall be established at the preceding session." The DTU pointed out that the rule specifically left out the words "mutually agreed on", and that either party could place anything on the agenda that it wished to discuss; however, the Board continued to prepare the agenda, continued to leave off the agenda the items DTU wished to discuss, and refused to discuss those items at the negotiating sessions because they were not on the agenda.
The 19 May meeting ended with the DTU saying that it would return to the bargaining table when the Board's counter-proposal package was received.
On 28 May Knight and the President of DTU agreed over the phone to resume bargaining *1247 on 3 June. The parties met on 3 June and the Board presented the expired contract as its counter-proposal package. Knight stated that the Board team was there only to transmit its package and not to bargain since no agreement to meet on that date had been made pursuant to the ground rules and no "mutually agreed to" agenda had been established. The parties agreed to meet on 8 June.
On 8 June Bates advised the Board's team that DTU was unavailable for negotiations from 19 June to 22 June because of schedule conflicts.
Thereafter the parties met daily from 14 through 19 June. During this period one agreement was reached on a "salesman" article. Throughout this period the Board contended that the issues of Summer School Assignment, Student Discipline, and a Fair Treatment Clause were either "inherent management rights" or that they were matters which were non-negotiable because they "infringed student rights". Other items such as Disruptive Student Policy, School Nurse, and Evaluations were also labeled non-negotiable by respondent. During the 18 June session, the Board's team stated that if DTU did not meet on Saturday, 19 June, the Board might have to file an unfair labor practice charge. Bates cancelled his conflicting meeting and the parties met again on 19 June.
The entire discussion on 19 June centered around the grievance procedure proposal. Knight, while admitting that employees were required to follow Board rules and policies, indicated that the Board would not put those policies into the contract. Bates informed the Board that DTU could meet Wednesday, 23 June, and inquired whether respondent would be available. Knight responded that the Board's team would be available. The DTU team, believing that a meeting was scheduled for 23 June, arrived for the session at 9:00 A.M. The Board's team did not appear.
Pursuant to a phone conversation between the DTU president and Knight, a meeting was scheduled for 24 June. The DTU president testified he advised Knight that DTU's team wanted to commence serious bargaining at that session; however, a memo received from Knight stated that the 24 June meeting was for the sole purpose of setting a date, time and agenda.
In accordance with the memo, the Board refused to bargain at the 24 June session insisting that to do so would violate the ground rules since no agreement had been reached at the prior meeting. After some exchange of words, Knight suggested that the meeting be adjourned for an hour and official reconvened after agreement pursuant to the ground rules.
The Board's second salary counter-proposal was submitted on 1 July. (The first counter-proposal on salary was included in the Board's "package counter-proposal", i.e. the old contract, submitted 3 June.) It was the existing salary schedule plus $100 across the board. Geiger testified that he and other DTU members had heard of this offer on the radio the previous Saturday, 26 June.
Negotiations were carried on during the week of 5 through 9 July without result. The DTU President testified, without contradiction, that Superintendent Sang had released to the press a copy of what he termed to be "non-negotiable issues". On 8 July DTU asked the Board team for the list, and it was advised that no such list existed. However, after pressing for approximately three to four hours, Mr. Knight produced a list which coincided with the list that had been distributed to the press. The list contained items which the Board indicated it would refuse to bargain on. On 9 July, after the DTU's team was unable to obtain counter-proposals from the Board, DTU declared an impasse.
Bargaining resumed on 3 August, at which time DTU demanded that the Board place on the table a salary schedule which had been released to the press on 22 July. The Board refused. The demand was renewed at bargaining sessions on 4 and 5 August. The salary schedule was finally submitted by the Board on 10 August.
During the 10 August session, Bates asked whether the Board's team had the authority to negotiate issues identified as *1248 "non-negotiable" by the Board. Kennedy, who replaced Knight as chief negotiator, replied that he had no authority to negotiate those issues and stated that while there was some overlap between management rights and working conditions, he refused to negotiate the "overlap" areas.
On 16 August DTU requested that the Commission petition the circuit court for injunctive relief in this case pursuant to Section 447.503(3)(b) of the Act.
A special master hearing was held on 20 August. (The special master's report was received by the parties on 1 September.)
On 21 August following breakdown of negotiations, Judge John McNatt of the Circuit Court in Duval County ordered the parties to resume collective bargaining.
At the 21 August meeting, the parties appeared to reach agreement on the language for a Discipline and Discharge article. However, after agreeing, the Board's team indicated it would not include the article in the collective bargaining agreement, but would append it to the contract so that problems arising under that article would not be subject to the contract's grievance procedure. The Board offered a transfer counter-proposal for inclusion in the contract, if DTU would agree to appending the Discipline and Discharge provision. The Board had previously refused to discuss transfer, calling it an "inherent management right". DTU rejected the package offer.
On 27 August the parties returned to the Circuit Court to report on the progress of negotiations.
No further negotiations were held after 9 September. On that date a final package offer was made to DTU which was essentially the same package offer of 21 August with the Transfer/Discipline and Discharge proposal included. At the same time this package was offered, the Board was rejecting the special master's report in toto.
The Board contends that the determinative issue in this case is whether the subjects labeled non-negotiable by the Board are mandatory subjects of bargaining. We do not agree. The complaint did not allege that the Board's refusal to bargain over certain subjects was, in and of itself, an unfair labor practice. The complaint charged that the Board "... did refuse and continues to refuse to bargain collectively in good faith ... by engaging in a course of conduct of surface bargaining... ."
The requirement of bargaining in good faith imposes upon the employer and the employee organization an obligation to come to the bargaining table with an open mind and a sincere desire to reach an agreement. N.L.R.B. v. Boss Mfg. Co., 118 F.2d 187 (7th Cir.1941). The legislature has recently defined good faith bargaining as including "... an obligation for both parties to actively participate in the negotiations with an open mind and a sincere desire, as well as making a sincere effort to resolve differences and come to an agreement." Chapter 77-343, § 6, Laws of Florida.
Whether a party bargains in good or bad faith is a factual determination based on the circumstances of the particular case. N.L.R.B. v. Truitt Manufacturing Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). When a party has been charged with failing to bargain in good faith, the overall conduct of the parties throughout the course of negotiations must be considered. School Board of Escambia County v. P.E.R.C., 350 So.2d 819 (Fla. 1st DCA 1977). Therefore, the determinative issue before us is whether there was competent substantial evidence before the Commission to support its finding that the Board failed to bargain in good faith. Section 120.68(10), Florida Statutes (1975).
Good faith is a matter of intent; it is a state of mind. N.L.R.B. v. Stanislaus Implement and Hardware Co., 226 F.2d 377 (9th Cir.1955). Usually, a party's state of mind can be determined only by inference from the party's conduct. Was the employer's (or union's) conduct consistent with an "open mind" and "a sincere desire ... to resolve differences and come to an agreement"? In this case, the Commission *1249 not only had evidence of the Board's state of mind in the form of its external conduct, which would be sufficient in and of itself to support the Commission's finding, but had before it a memorandum, written by John Kennedy to Superintendent Sang prior to the beginning of negotiations concerning Bates, DTU's chief negotiator, which contained the following:
"His main weakness is that he has a low frustration threshold himself, especially when he is told that certain issues aren't negotiable, e.g. class size, hours which teachers work, and number of periods in a school day. In this respect the fact that our negotiations are open to the press may be an advantage to us because Mr. Bates may make statements which will make the DTU appear unfavorable when reported in the press... .
"The best way to handle him is to establish firm ground rules, prior to negotiations... . If he violates these ground rules during negotiations, he should be firmly reminded of the rules with the press present. If he continues to violate them after this warning, the school board team should walk out on him a time or two until he gets the message. However, to repeat, this last step should be taken only after publicly warning him so that the press will not interpret the school board team's action as refusing to negotiate.
"Finally, as a matter of strategy it would probably be good to hang some label such as `hired gun' or `outside hit man' on him, if such can be done. He is sensitive to this kind of approach, and it may help to give Duval County teachers the feeling that national union interest [sic] are being negotiated rather than their own local interests."
Clearly, the intent of the Board, as reflected by its conduct and the above plan of action, was to avoid its statutory responsibility to bargain in good faith. We hold that there was competent substantial evidence to support PERC's finding that the Board failed to bargain in good faith.
Section 447.503(4)(a), Florida Statutes (1975), states:
"If, upon consideration of all the evidence taken, the commission finds substantial evidence that an unfair labor practice has been committed, it shall .. . issue and cause to be served an order requiring the respondent party to cease and desist from the unfair labor practice and to take such positive action ... as will effectuate the policies of this part."
In this case, the Commission ordered the Board to meet with representatives of the DTU and "... bargain in good faith with respect to the monetary benefits sought by the bargaining representative for fiscal year 1976-77". The Board argues that PERC lacks jurisdiction to order the Board to negotiate with the DTU after negotiations have gone through the impasse procedure provided by Florida Statute 447.403. In its order the Commission stated: "An employer will not be permitted to engage in a course of conduct tantamount to a refusal to bargain and subsequently be allowed to `cleanse' its illegal activity through the statutory impasse procedures." It is clear that if impasse proceedings could be used by an employer to circumvent its duty to bargain in good faith, the purpose of the Act would be defeated. We therefore hold that PERC had the authority under Section 447.503(4)(a) to order the Board to bargain in good faith over monetary benefits for 1976-77.
The Public Employees Relations Act is the law of our State. Whether we agree with it or not, we must comply with it. If changes are desired, they must be made by the Legislature.
Every public employer, public employee and union must exert every effort to cooperate with each other and to build respect for each other. Collective bargaining is not and should not be a game. Representatives of the public employer and the union should and must be able to sit down together and negotiate an agreement which will be beneficial and fair to all parties. There is too much at stake to play games. Idealistic? Perhaps. Too much to ask? We think not.
The Board also urges that Section 447.401, Florida Statutes (1975), which provides *1250 for binding arbitration of grievances, is unconstitutional. This issue is not properly raised by this case, therefore we do not address it.
Accordingly, the order of PERC is affirmed.
SMITH and ERVIN, JJ., concur.