**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**RYBOLD HEATER COMPANY, Respondent.**

No. 18472.

United States Court of Appeals Sixth Circuit.

March 26, 1969.

---

Jerome Weinstein, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, William Wachter, Ronald Wm. Egnor, Attys., N.L.R.B., Washington, D. C., on brief, for petitioner.

Roy E. Browne, Akron, Ohio, Hershey, Browne, Wilson, Steel, Cook & Wolfe, Akron, Ohio, on brief, for respondent.

Before EDWARDS, CELEBREZZE and PECK, Circuit Judges.

CELEBREZZE, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order of June 13, 1967 directing Respondent to bargain collectively with the Union [1] on request and to cease and desist from photographing or pretending to photograph the Union's picket line activity. Respondent was also directed to post the customary notices.

The Board, in agreement with its Trial Examiner, found that Respondent's cinematic activities violated Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. and that Respondent twice violated Section 8(a) (5) and (1) of the Act by first refusing to produce records supporting its claimed inability to grant a wage increase, which along with the alleged Section 8(a) (1) violations led to the unfair labor practice complaint in this case, and second, by refusing to sit down and bargain with the union once the unfair labor practice complaint had been filed with the Board. No jurisdictional question is presented.

The unfair labor practice hearing was held on January 31, 1967 in Ashland, Ohio, where Respondent maintains its principal office. The following facts were developed:

Respondent manufactures and sells heating and air conditioning units and the Union has represented its production and maintenance employees since 1941. In 1966, the Union requested that Respondent begin negotiations with it for a new contract since the old contract was to expire on July 31st of that year. Meetings began well before the expiration date which the parties agreed to extend until August 7, 1966. During one of these meetings, Respondent said that it could not grant a wage increase. To buttress its claim, Respondent offered a financial report for the years 1964–1965 which had been prepared by its accountants. This report included a balance sheet and a statement of Respondent's net income for those years. But Reeder, the Union's chief negotiator, declined to look at it on the ground that the subject of wages was still premature since the parties were still negotiating non-economic issues. The report remained in the meeting room.

During a meeting of August 6, 1966, the Union told Respondent that it would call a strike for Monday, August 8th. Respondent replied by offering a five-cent general wage increase, still insisting that it could not afford to do so, but basing the wage increase, so Respondent said, on a gamble that its business would improve. Respondent made this increase contingent on there being no walkout on August 8th and demanded that the old contract remain in effect for two more years. The Union found this unacceptable and on Monday, August 8th,

Respondent's production and maintenance employees went out on strike and began picketing Respondent's Ashland plant.

On August 14th Respondent withdrew the wage offer and urged the Union to agree to a two-year extension of the old contract. Respondent adhered to this position throughout August and most of September, insisting that the strike made it even more unable to grant a wage increase. On September 20th, Reeder wrote to Respondent requesting books and records so that they could "bargain intelligently on economic matters." Respondent did not reply to this letter, believing that the 1964–1965 financial report, which had been made available earlier to the Union and which had been rejected by it, was enough. On October 17th, Reeder and Johns, the Union's District Director, met with Respondent's negotiator and requested data reflecting Respondent's financial situation as of August, 1966, when Respondent first insisted that it could not afford to pay a wage increase. Reeder testified during the hearing that he "wanted * * the up-to-date financial position of the Company to show their ability or inability to pay." Respondent still refused to submit any more than the 1964–1965 report.

On October 28th, the Union filed unfair labor practice charges resulting in the order before us. On November 10th, Reeder telephoned Respondent's Vice President Smith, who had led negotiations for Respondent, offering to sit down and negotiate at any time. Smith refused, referred to the Union's unfair labor practice complaint and added that he would let the Board handle the matter. This was also the substance of Respondent's telegraphic reply of November 15th to the Union, which had put its request of November 10th into a telegram of that date to Respondent. The strike was still in progress when the hearing began on January 31, 1967.

Smith testified during the hearing that Respondent's bookkeeper kept a current journal of its accounts payable and receivable as well as monthly records of purchases, sales, and payroll costs. He testified, moreover, that a financial report of Respondent's affairs was available "right after the first of the year" which he saw, but did not make available to the Union.

The Board found Section 8(a) (5) and (1) violations on September 20, 1966, when the Union first requested that Respondent make its financial records available to it, and on November 15, 1966, when Respondent refused to meet with Union representatives under any circumstances because of the commencement by the Union of the unfair labor practice proceedings.

▮ A union may properly insist on relevant financial data to weigh an employer's claimed inability to grant wage increases. "Good-faith bargaining necessarily requires that claims made by either bargainer should be honest." N.L.R.B. v. Truitt Manufacturing Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1955). So the parties must substantiate them. N.L.R.B. v. Ohio Car & Truck Leasing, Inc., 361 F.2d 404 (6th Cir. 1966); N.L.R.B. v. Jacobs Manufacturing Co., 196 F.2d 680 (2d Cir. 1952). By refusing to make available to the Union current financial records that it had in its possession, Respondent manifested its lack of good faith.

▮ So did Respondent's refusal to sit down and bargain with the Union on and after November 15, 1966. A refusal to bargain because of the filing of unfair labor practice charges is not a defense to a complaint brought under Section 8(a) (5) of the Act. N.L.R.B. v. Jones Furniture Manufacturing Co., 200 F.2d 774 (8th Cir. 1953); see Stark Ceramics, Inc. v. N.L.R.B., 375 F.2d 202 (6th Cir. 1967). Respondent must show that it did all that was reasonably possible to reach agreement. This is all that the National Labor Relations Act requires. N.L.R.B. v. Ohio Car & Truck Leasing, Inc., 361 F.2d 404 (6th Cir. 1966). By refusing to honor the Union's request for current financial data, and

by insisting on having the Labor Board field the dispute between it and the Union Respondent did not make such a showing. The bargaining order was therefore proper and we grant enforcement to it.

█ The Board also found that Respondent violated Section 8(a) (1) of the Act by unlawful surveillance of the Union's picketing activities. Company witnesses testified that they pretended on occasion to take moving pictures of the pickets and of employee efforts to dissuade truckdrivers from carrying away or delivering goods to Respondent's plant. The effect of Respondent's photographic exercises—often with unloaded cameras—was to scatter the pickets and halt their activities. Respondent's activities not only tended to, but did interfere with protected activity secured by Section 7 of the Act. N.L.R.B. v. Ford, 170 F.2d 735 (6th Cir. 1948); N.L.R.B. v. Associated Naval Architects, Inc., 355 F.2d 788 (4th Cir. 1966); Tennessee Packers, Inc., 124 N.L.R.B. 1117.

This is not the situation that confronted the Board in Stark Ceramics, Inc., 155 N.L.R.B. 1258, enforced,` 375 F.2d 202 (6th Cir. 1967), where the Board found that photographing of picketing employees did not violate Section 8(a) (1) of the Act. The photographs in Stark were taken to establish for purposes of an injunction suit that pickets engaged in violence. Although Respondent in the instant case did allege that photographs were taken for use as evidence in two unsuccessful injunction proceedings subsequently had, it turns out that none of them were introduced into evidence in either proceeding. In fact, some of the photographs were never developed and others were processed after the suits had been terminated. See Hilton Mobile Homes, 155 N.L.R.B. 873, enforced in part, denied in part on other grounds, 387 F.2d 7 (8th Cir. 1967). The Board's order, therefore, directing Respondent to cease and desist from photographing or pretending to photograph protected activity for the purpose of interfering with it was not only proper, but substantially supported by the record. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Enforcement of the Board's order will be granted.

PECK, Circuit Judge (concurring).

While I am in agreement with the conclusions reached in the majority opinion, I have reservations concerning the emphasis placed on the fact that the photographs in controversy were not introduced into evidence in the injunction proceedings, and that some "were never developed and others were processed after' the suits had been terminated." Unquestionably, as stated in the majority opinion, "[r]espondent's activities [with unloaded cameras] not only tended to, but did interfere with protected activity. * * *" This being true, whether photographs were ultimately received in evidence or even developed is immaterial and the emphasis on those subjects seems capable of being read as a limitation on what would otherwise be a proper means of recording occurrences.