162 F.3d 907
 159 L.R.R.M. (BNA) 3025, 137 Lab.Cas. P 10,310
 CLOCK ELECTRIC, INC., Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
International Brotherhood of Electrical Workers Local No. 38
(97-5999), Intervenor.
 Nos. 97-5999, 97-6106.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 24, 1998.
Decided Dec. 9, 1998.
 
 Tim Tusek (argued and briefed), Boardman, Ohio, for Petitioner/Cross-Respondent.
 Aileen A. Armstrong (briefed), Frederick C. Havard (briefed), John D. Burgoyne, Robert J. Englehart, Jeffrey Horowitz (argued and briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross-Petitioner.
 Joyce Goldstein (briefed), Bryan P. O'Connor (briefed), Goldstein & Roloff, Cleveland, Ohio, for Intervenor in No. 97-5999.
 Before: KENNEDY, WELLFORD, and BOGGS, Circuit Judges.
 KENNEDY, J., delivered the opinion of the court. WELLFORD, J. (pp. 919-20) and BOGGS, J. (p. 920), delivered separate opinions concurring in part and dissenting in part.
 
 OPINION
 
 1
 KENNEDY, Circuit Judge.
 
 
 2
 Adopting recommendations made by an Administrative Law Judge, the National Labor Relations Board (the "Board") concluded that the petitioner, Clock Electric, Inc. ("Clock Electric" or "the Company") violated the National Labor Relations Act by (1) refusing to hire two employees because of union membership, and (2) photographing an employee while picketing. Clock Electric has petitioned this court for review of the Board's order, and the Board has cross-petitioned for enforcement. For the reasons set forth in this opinion, we conclude that the Board's unfair labor practice findings are not supported by substantial evidence on the record as a whole with regard to one of the Company's two hiring decisions. We shall therefore grant the Company's petition and deny the Board's cross-petition as to this hiring decision only. We shall grant enforcement of the Board's order insofar as it relates to the Company's second hiring decision and its unlawful photographing of a picket.
 
 I.
 
 3
 Clock Electric is a nonunion electrical contractor that has been operating in Cleveland, Ohio for over 24 years. The Company is principally owned and run by Charles ("Chuck") Clock, the Company's president, who was an electrician for 15 years before going into business for himself. Chuck Clock's daughter, Lisa Clock, is the Company's office manager, who performs a number of administrative duties including oversight of the hiring process.
 
 
 4
 In May 1994, the Company placed an advertisement in a local newspaper seeking to hire journeyman electricians. When the International Brotherhood of Electrical Workers, Local Union No. 38 ("IBEW" or the "Union") learned that the Company was hiring, it encouraged several Union members who were unemployed to apply for the job in an effort to organize the Company. Among the applicants sent by the Union were Richard Crumbley, James Embrescia, and Orin Lemin. The Company also considered numerous other applicants, and eventually hired two of the applicants: Orin Lemin and Joseph Gelski, not a union member.
 
 
 5
 Richard Crumbley arrived to complete the application for employment on May 16, 1994. At the time, he was wearing a jacket with the Union logo. On his application, Crumbley indicated that he possessed thirteen years of experience as an electrician, served a four-year apprenticeship program at a union-affiliated trade school, had a fire alarm license, and had graduated from high school. The application also requested information about past employment. Crumbley listed his most recent salary as $23.48 per hour, which was the union rate applicable at the time. His "reason for leaving" each of the three jobs listed on the application was "lack of work." After Crumbley completed his application, the Company gave him a review electrical test on which he scored 15 out of 19 questions correctly. Upon Crumbley's submission of his application to Lisa Clock, she told Crumbley that the Company would contact him for an interview. It never did.
 
 
 6
 James Embrescia applied for the job on May 17, 1994. He was also wearing a Union logo. Embrescia had approximately eight years of experience as a journeyman electrician and indicated on the application that he had attended a four-year IBEW/NCEA Joint Apprenticeship program, had fire alarm and fiber optics training, and had graduated from high school. Several past employers listed on his employment record were contractors known to Chuck Clock to be union contractors. Embrescia documented all of his past employers back to 1986, which even covered his four-year apprenticeship period. He listed more than seven past employers between 1989 and 1994. In some cases his "reason for leaving" was a "reduction in work force," and in others he indicated he had quit. Embrescia too indicated he was most recently paid at the union rate of $23.48. He scored 13 out of 19 questions correctly on the electrical review test. Lisa Clock told Embrescia, as she had told Crumbley, that the Company would contact him for an interview. On his own initiative, Embrescia contacted the Company on May 24, 1994 and a few times thereafter to ask about the status of his application. Each time he was told to call back later because hiring had been placed on hold. Finally, on June 10, 1994, Embrescia returned to Clock Electric to fill out a new application because he believed the Company's policy was to discard applications after 30 days. At that time, Lisa Clock told him there was no need to reapply because the Company was not hiring.
 
 
 7
 Joseph Gelski, like Embrescia, applied on May 17, 1994. Gelski had worked in the past for one of the Company's customers and was recommended by its owner, Hank Schwartz. In the course of his employment with Schwartz, Gelski performed some simple work alongside some of Clock Electric's employees for a period of two weeks, approximately two years before he applied for the job with Clock Electric. Gelski did not graduate from high school or serve an apprenticeship, but indicated on his application that he had attended the West Side Institute of Technology and was receiving fire alarm training. He worked for three employers between 1989 and 1994 and was most recently compensated at $11.00 per hour. Gelski received a test score of 16 out of 19. On the afternoon of May 17, 1994, Chuck Clock reviewed the applications of Crumbley, Embrescia and Gelski, and telephoned Gelski to arrange an interview. He was interviewed and hired on May 19, 1994.
 
 
 8
 Orin Lemin, a covert union applicant, submitted an application for the position about a week later, on May 24, 1994. He did not reveal that he was a Local 38 member and his application was largely fabricated. His application accurately indicated that he had been a journeyman electrician for approximately three years, but listed as past employers three small non-union contractors for whom Lemin had never worked. For two of these employers, he neglected to include a "reason for leaving." For the remaining employer, he failed to provide the name of his supervisor as requested. He stated that his most recent wage rate was $10.25. Like Crumbley, Lemin answered 15 out of 19 test questions correctly. The Company interviewed and hired him on May 26, 1994, two days after he applied. At the time of the interview, Lemin asked Lisa Clock whether he could refer friends to Clock Electric to apply for jobs. She told Lemin that they were not hiring, but if an applicant mentioned Lemin's name as a reference they would be considered. Lemin started work on June 1, 1994.
 
 
 9
 Shortly after starting at Clock Electric, Lemin asked the Field Superintendent, Jim Bratsch, several times without success about the possibility of obtaining a wage increase for himself and for "the men." In response, Bratsch initially told him that he would think about it, and later told Lemin that he needed to do more work before the Company would give him a raise. In early July, after having been sent to work on a project at B.F. Goodrich, Lemin revealed his union affiliation to fellow Clock Electric employees and informed them that he was there to "organize the unorganized." Meanwhile, Lemin continued to approach Lisa Clock and Jim Bratsch about a pay increase. On July 14, Bratsch gave Lemin his 30-day performance evaluation with an overall rating of slightly less than fair. The next day, the Union picketed the B.F. Goodrich job site. Lemin picketed with two other Union agents just before the morning shift and again during the lunch break. Lemin's foreman, Alan Conn, called the office to inform management that Lemin had been picketing. Conn was instructed to "take a picture and see what the sign says." During the lunch break, Conn drove closely past the pickets and snapped a still photograph of Lemin, who was grinning and holding a sign that read, "Clock Electric Turns Back The Clock On Fair Wages and Benefits."
 
 
 10
 Over the several weeks that followed the picketing at B.F. Goodrich, Lemin was reassigned to various projects. According to the Company, Lemin performed substandard work at several of these job sites. On one occasion he neglected to wear safety glasses and was instructed to redo some work on circuit breakers and an outlet he had installed improperly. At another site he twice entered restricted areas at the customer's facility and failed to leave the premises when the Company was ordered off the job. The Company eventually discharged Lemin on August 23, 1994.[1]
 
 
 11
 Based on the foregoing events, the Union filed several charges against the Company between July and September 1994 alleging unfair labor practices. On March 27, 1997, the Administrative Law Judge (the "ALJ") issued a recommended decision and order in which he concluded that Clock Electric violated Sections 8(a)(1) and (3) of the Act by refusing to hire Crumbley and Embrescia, and violated Section 8(a)(1) of the Act by photographing Lemin on the picket line. The ALJ recommended that the Company be ordered to offer immediate employment to Crumbley and Embrescia at rates paid to electricians hired by the Company with commensurate experience, and to make both individuals whole for wage and benefit losses they may have suffered as a result of the discrimination. The Board issued a decision and order on July 14, 1997 affirming the ALJ's findings and conclusions, and adopting his recommended order in toto.
 
 II.
 
 12
 In considering the Company's petition for review, the Board's "findings of facts, as well as its application of law to fact, may not be disturbed where substantial evidence on the record taken as a whole supports the Board's findings and conclusions." N.L.R.B. v. Vemco, 989 F.2d 1468, 1473 (6th Cir.1993)(citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 295 (6th Cir.1985), cert. denied, 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986); 29 U.S.C. § 160(e), (f)). Substantial evidence encompasses "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); see N.L.R.B. v. Thompson Products, Inc., 97 F.2d 13, 15 (6th Cir.1938). The appellate court should consider the evidence contrary to the Board's conclusions, but may not conduct de novo review of the record. Union Carbide Corp. v. N.L.R.B., 714 F.2d 657, 660 (6th Cir.1983).
 
 
 13
 The appellate court must also accord deference to the Board's credibility findings and to inferences drawn from the evidence on the record. This court has observed that "[i]n reviewing the credibility findings and the inferences drawn by the Board from the evidence, the test for a reviewing court is whether the conclusions are reasonable in light of the proven facts." N.L.R.B. v. Kentucky May Coal Co., 89 F.3d 1235, 1242 (6th Cir.1996)(citing N.L.R.B. v. Paschall Truck Lines, Inc., 469 F.2d 74, 76 (6th Cir.1972); N.L.R.B. v. Nevada Consol. Copper Corp., 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305 (1942)). Thus, as to credibility determinations, the Board's findings will be upheld as long as they have a rational basis. See N.L.R.B. v. Fluor Daniel, Inc., 102 F.3d 818, 837 (6th Cir.1996).
 
 A. Refusal to Hire
 
 14
 The Board adopted the ALJ's finding that the Company violated Section 8(a)(1) and (3) of the NLRA by refusing to hire Crumbley and Embrescia. The ALJ found that the Company's reasons for not hiring both individuals were pretextual and had it not been for their union affiliation, both would have been hired into the two journeyman electrician positions that were available at the time. We disagree. Substantial evidence on the record in fact does not support the Board's conclusion that the Company's reasons for hiring Gelski over Crumbley and Embrescia were pretextual. While we agree with the Board that the General Counsel stated a prima facie case of discrimination in hiring on the basis of union membership, we cannot agree that Clock Electric failed to establish that it would have made the same hiring decisions even in the absence of protected activity with respect to Gelski. Using the factors that the Company claims to consider in making hiring decisions, the weight of the evidence establishes that it would have hired Gelski even if Crumbley and Embrescia were not union members. Substantial evidence does, however, support the Board's conclusion that Clock Electric discriminated on the basis of union membership when it hired Lemin over Crumbley or Embrescia.
 
 
 15
 The standard for deciding cases involving charges of employment actions motivated by an employer's anti-union animus were set forth in Wright Line, 251 NLRB 1083 (1980), and approved by the Supreme Court in N.L.R.B. v. Transportation Management Corp., 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). The General Counsel must persuasively establish that the evidence supports an inference that protected conduct was a motivating factor in the employer's decision. In a refusal to hire case, the General Counsel specifically must establish that (1) the employer is covered by the Act; (2) the applicant is covered by the Act; (3)each alleged discriminatee actually applied for a job and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications the applicant was not hired; (5) anti-union animus contributed to the decision not to hire an applicant; and (6) after his rejection, the position remained open and the employer continued to seek applications from persons with the applicant's qualifications. See Architectural Glass & Metal Co., Inc. v. N.L.R.B., 107 F.3d 426, 431(6th Cir.1997)(citing N.L.R.B. v. Fluor Daniel, Inc., 102 F.3d at 832). If a prima facie case is established, the burden then shifts to the employer to establish by a preponderance of the evidence that it would have made the same decision even in the absence of protected activity. T & J Trucking Co., 316 N.L.R.B. 771, 316 NLRB No. 120, 149 L.R.R.M. (BNA) 1009 (N.L.R.B., Mar. 17, 1995). The prima facie case "simply serves to eliminate the most common nondiscriminatory reasons for the rejection of a job applicant." Architectural Glass & Metal, 107 F.3d at 431 (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981)).
 
 
 16
 The Board found--and substantial evidence on the record supports--that elements (1) through (4) are satisfied in this case. Crumbley and Embrescia were union members and qualified applicants who submitted applications for employment and were then refused employment with the Company. Substantial evidence also supports the Board's finding that the Company was alerted to Crumbley's and Embrescia's union membership at the time they applied. Each applicant listed his completion of a union-affiliated apprenticeship program. Chuck Clock, who reviewed the applications, testified that he recognized that these apprenticeship programs were union-affiliated. Both Crumbley and Embrescia included in their employment histories past wage rates consistent with the union wage rate and prior employment with contractors recognized by Chuck Clock as union contractors. Finally, each applicant arrived at Clock Electric to complete an application wearing a piece of clothing that displayed the Union's logo.
 
 
 17
 We also find that the inferences drawn and conclusions made by the ALJ that the Company harbored anti-union animus, and that this animus contributed to its hiring decision, are reasonable in light of the proven facts. Of 13 applicants who responded to the Company's advertisement, only Crumbley, Embrescia, and another union applicant named Jerry Gershen (whose application also listed union-affiliated training programs) were not called for the purpose of arranging an interview.[2] In contrast, the Company attempted to contact other applicants whose completed applications evidenced no union ties. The Company contacted John Yonek, a non-union applicant, despite its awareness that Yonek had been fired from his last job. The Company also permitted Mike Tallon, a covert union applicant who used Lemin's name as a reference, to complete an application while on the very same day the Company informed Embrescia that it was purportedly "not hiring" and that he need not fill out a new application. The Company then attempted to contact Tallon for a second interview, but made no effort to contact Embrescia despite his diligent efforts to follow up on his application. The Company's alleged duplicitous treatment of applicants is also supported by credible testimony from Lemin and a transcript of a tape-recorded conversation between Lemin and Lisa Clock in which Clock told Lemin that he could send friends to the Company to apply, but to make sure that they mentioned his name. As the ALJ's recommendation aptly observes, "[i]f nothing else, this evidence shows that the Company was carefully screening the applicants and discouraging those suspected of being union members, while pursuing those who appeared to be not affiliated with a union." Clock Electric, Inc., 323 NLRB No. 211, 158 LRRM (BNA) 1064 (N.L.R.B., Jul.14, 1997).
 
 
 18
 The Company argued that it has hired union members in the past, which should preclude a finding that it harbors anti-union animus. The Company pointed to three employees as examples. None of the three, however, belonged to a union when hired.[3] The Company also pointed to its layoff and recall of another employee, Kenneth Criss. The Company discovered Criss was a Union supporter only after the layoff, when Criss began openly soliciting signature cards on behalf of the Union. Chuck Clock explained that Criss was laid off because he had an attendance problem, but was recalled because he was "a good electrician." The evidence reveals, however, that Criss was not recalled until after the Union filed the first unfair labor charge in this case. After careful review, we find that reasonable minds might accept the evidence as adequate to support the ALJ's conclusion that "[t]hese seemingly inconsistent statements and the timing of the recall soon after the unfair labor practice was filed raises some doubt about the Company's true motives for the layoff and recall of Criss, and does nothing to offset the General Counsel's evidence of animus." Clock Electric, Inc., 323 NLRB No. 211, 158 LRRM (BNA) 1064 (Jul. 14, 1997).
 
 
 19
 Although we agree with the Board and the ALJ that the General Counsel stated a prima facie case of discrimination in hiring on the basis of union membership, we cannot agree that Clock Electric failed to establish that it would have made the same hiring decision even in the absence of protected activity with respect to Gelski.
 
 
 20
 Clock testified that, when making a hiring decision, the company considers test results, skill, experience, employment history, how applicants handle themselves during the application process, their appearance, attendance, referrals and earnings history. Purportedly using these criteria, the Company made two discrete hiring decisions for two positions, at two different times, with two different applicant pools to consider. As of May 19, 1994, the qualified applicant pool included Gelski, Crumbley, and Embrescia. Unlike Wright Line, the position did not remain unfilled. It was filled by Gelski. After filling the first available position, the Company made a second hiring decision on May 26, 1994. At that time, the qualified applicant pool included Crumbley and Embrescia, whose applications had been on file for one week, and Lemin, who had just recently applied.[4] We shall address each hiring decision in turn, since the hiring decisions were made at different times with different applicants.
 
 1. The Decision to Hire Joseph Gelski
 
 21
 With regard to the Company's hiring of Gelski over Crumbley and Embrescia, the Board adopted the ALJ's determination that, other than a personal recommendation from a customer, there was "no lawful reason" for the Company to prefer Gelski over the union applicants. The ALJ found the Company's arguments in support of its decision to hire Gelski unpersuasive because he determined that there was little difference between the test scores and employment records of the applicants, the union applicants had more practical experience than Gelski, and the Company's reasons for relying on wage histories were unreliable. While conceding that the Company's reliance on a recommendation from its customer is "understandable," the ALJ concluded that "standing alone" the recommendation was not enough to tip the scales in Gelski's favor.
 
 
 22
 We disagree. When it assessed the Company's decision to hire Gelski, the Board failed to take into account whatever in the record fairly detracts from its determinations, see Universal Camera, 340 U.S. at 488, 71 S.Ct. 456, and thereby disregarded the bulk of the evidence which proved Gelski was the preferable candidate even in the absence of protected activity. In drawing their conclusions, the Board and ALJ substituted their own preferences as to which criteria should "weigh" more in a hiring decision: the ALJ's recommended decision emphasized duration of practical experience in the industry and all but completely discounted test scores, personal recommendations and prior earnings. It was improper for the Board to adopt his recommendation as the weight of the evidence tends to show that the Company would have hired Gelski even if Crumbley and Embrescia had not been not Union members.
 
 
 23
 First, we agree with the ALJ's finding that Crumbley and Embrescia possessed more practical experience than Gelski in terms of training and the raw number of years that each applicant worked in the industry. Gelski had four and a half years' experience as an electrician and was still in the process of completing some of his training. Embrescia completed a four-year apprenticeship and had another four years' experience as a journeyman electrician. Crumbley also completed a four-year apprenticeship and worked nine years as a journeyman electrician. But in light of the numerous factors that the Company purports to consider, experience and employment history alone is not necessarily dispositive. The remaining factors that Clock Electric claims to consider weigh in favor of Gelski.
 
 
 24
 The ALJ also concluded that the employment histories of all three applicants were basically indistinguishable as indicators of job stability. We disagree. The ALJ observed that it appeared as though each of the applicants had worked three jobs in the previous two years, such that Gelski's employment history was no better than either Crumbley's or Embrescia's in terms of job stability. He observed that Embrescia's employment history merely appeared more unstable because he had listed all of his positions for the previous eight years, including his jobs as a union apprentice, and noted that apprentices tend to moved from job to job to obtain a broader range of experience. The facts on which the ALJ relied, however, were incomplete and insufficient to support his comparison of the applicants. Even excluding the time from approximately 1986 to 1990 during which Embrescia was an apprentice, he still worked several more jobs than Gelski during the period from 1990 to 1994. Crumbley only documented his employment history back to 1992, so Crumbley and Gelski could only fairly be characterized as equivalent candidates from 1992 to 1994. The Company possessed additional employment information about Gelski dating from 1989 to 1992.[5] There was simply no information about Crumbley from this period with which to compare it. As between Gelski and Embrescia, the applications show that Gelski at the very least had a more stable employment history than Embrescia over a longer period of time.
 
 
 25
 In addition to job stability, the Company also claims to consider test scores. Gelski received the highest test score of the three applicants under consideration at the time he was hired. The ALJ downplayed this fact by noting that the differences between the applicants' scores were minimal: Gelski received a 16 out of 19, Crumbley a 15 out of 19, and Embrescia a 13 out of 19. Yet a difference of even one to three points is significant given that the test has so few questions overall. The Company essentially used the test as an objective measure of professional competence and tool of comparison. The ALJ simply offered no rational basis for discrediting the Company's reliance on test scores in making hiring decisions and the weight of the evidence relating to this factor unequivocally favors Gelski.
 
 
 26
 Gelski also possessed two qualifications that none of the other applicants had--a personal recommendation from Hank Schwartz, a longtime client of Clock Electric, and actual experience working alongside Clock Electric's employees. As a preliminary matter, we defer to the ALJ's decision to credit Gelski's testimony over that of Chuck Clock as to the nature and extent of Gelski's prior interaction with Clock Electric. Gelski testified that while working for Hank Schwartz some years earlier, he assisted Clock Electric employees on one of their projects. He testified that his contact with Chuck Clock and Clock Electric's employees was brief and that the tasks he performed were simple: occasionally he would retrieve electrical parts for the Clock electricians or if they needed a hand pulling wire he would help. In contrast, the ALJ found that Chuck Clock's testimony about his past work with Gelski made their interaction appear more substantial that it actually was. The ALJ credited Gelski's version of the facts and we defer to his determination. Based on these facts, the ALJ's opinion appears to infer that Chuck Clock did not possess enough information about Gelski to conclude that his qualifications exceeded those of Crumbley and Embrescia. Yet the Board and ALJ glossed over other evidence on the record that supports a contrary conclusion: the balance of Chuck Clock's testimony on this issue centered not on his own personal familiarity with Gelski's capabilities, but on the weight of Hank Schwartz's recommendation. Chuck Clock confirmed that Schwartz's recommendation carried some weight in the hiring process and that he had previously hired another of Schwartz's employees who worked out very well. The Board's order arbitrarily dismissed the recommendation by noting that "standing alone," it is "not enough to tip the scales in Gelski's favor." Clock Electric, Inc., 323 NLRB No. 211, 158 LRRM (BNA) 1064 (N.L.R.B., Jul.14, 1997). As we have noted, the recommendation did not stand alone. Combined with better test scores, more stable employment history, and as we shall discuss, earnings history and expectations that dovetailed with the Company's average starting wages, it gave Gelski an advantage over the other two applicants. Although it is unnecessary to determine in this case whether Schwartz's recommendation by itself would be enough to justify the Company's hiring decision, we decline to rule out the possibility that a recommendation alone would justify a hiring decision in some other case. Even passing familiarity with one job applicant may suffice to distinguish him (either favorably or unfavorably) from another applicant who is a total stranger.
 
 
 27
 Finally, Gelski was a superior applicant with regard to earnings history and expectations. The ALJ concluded that the Company failed to prove that applicants who take pay cuts tend to leave more quickly than those with lower past earnings. We agree. But the Company need not rely on this "high wage defense" to support its decision to hire Gelski over Crumbley and Embrescia. The facts in the record show that Gelski's earnings history and wage expectations were firmly in line with what the Company was willing to offer. The Company typically offered an average starting wage of $11.00 to $12.00 per hour. Gelski was last paid $11.00 per hour, and indicated on his application that he expected to start at Clock Electric at $11.00 per hour. In comparison, Crumbley and Embrescia were last paid at $23.48 and indicated on their applications that their salary expectations were "open" or "negotiable." It was evident from the face of Gelski's application that expenditure of time or resources on starting wage negotiations would be unnecessary. Even if Crumbley and Embrescia had listed past wage rates that were not obviously union scale, Gelski's wage expectations made him a conclusively suitable candidate for hire.
 
 
 28
 In light of the foregoing facts and considering all of the factors that the Company itself professes to consider in making its hiring decisions, we conclude that the Company demonstrated that it would have hired Gelski over Crumbley and Embrescia even in the absence of protected activity. The Board's conclusion to the contrary is not reasonable in light of the record facts. We do not reach the same conclusion as to the second hiring.
 
 2. The Decision to Hire Orin Lemin
 
 29
 Once Gelski was hired, the Company had one more opening for a journeyman electrician. At the time it decided to hire Orin Lemin, the Company also had Crumbley's and Embrescia's applications on file. The Board's finding of discrimination with respect to the hiring of Lemin is supported in part by the candidates' applications, and in part by the circumstances surrounding Clock Electric's reaction to Embrescia's follow-up inquiries and its decisions as to whom to contact for interviews.
 
 
 30
 Unlike Gelski, Lemin was not conclusively a superior candidate from the face of his application and the information available to Clock. Most of Lemin's qualifications did not vary significantly from either Crumbley's or Embrescia's. None of the three had a personal recommendation or prior contact with the Company. Lemin received exactly the same score as Crumbley on the electrical review test. Each applicant indicated that he was willing to negotiate the starting wage rate.
 
 
 31
 As for experience, Crumbley and Embrescia seemed the better candidates. The ALJ determined that Crumbley and Embrescia were superior candidates with regard to the extent of experience possessed by each. Lemin's application listed five years' experience described only in rather oblique terms compared to Crumbley's and Embrescia's applications, which listed thirteen years and eight years of experience, respectively, and which detailed time spent in apprenticeships and in fire alarm and fiber optics training. With regard to job stability, we agree with the ALJ that Lemin's employment history was "only slightly better" than the other two applicants as Lemin appeared to have worked two different jobs in the prior two years, whereas Crumbley and Embrescia had each worked three.
 
 
 32
 Neither the ALJ nor the Board specifically addressed Lemin's earnings history. Even though Lemin completely fabricated his employment record, it would seem from the face of his application that his earnings history comported with what the Company would be willing to offer as a starting wage. Lemin's application stated that he had last earned $10.25 per hour. One point that distinguishes Lemin's application from Gelski's however is that Gelski's wage expectations were clear from his application. In contrast, the Company could not definitively ascertain what Lemin might hope to earn without contacting him to find out. As the record shows, the Company chose to contact Lemin, but not Crumbley or Embrescia, about setting up an interview. In addition, though the Company attempts to rely on its "high wage defense" as a justification for not following up with Crumbley and Embrescia, in the case of Lemin, the difference in past wages was the sole distinction. The facts relating to Lemin's interview permit the inference that Clock Electric evaluated applicants for the remaining electrician position not only based upon their objective qualifications, but also based upon union membership or support.
 
 
 33
 The Company contacted Lemin on May 24, 1994, the same day he came in to complete his application, for the purpose of arranging an interview. This happened to be the same day that Embrescia first called the Company to check the status of his application and was told that hiring had been put on hold.
 
 
 34
 Reviewing the evidence on the record as a whole, we agree that there is substantial evidence to support the Board's decision that the Company discriminated against Crumbley and Embrescia on the basis of union membership in hiring Lemin. In light of our conclusion that the Company properly filled one of its vacancies when it hired Joseph Gelski, we will remand to the Board to determine the number of positions that would have been available at the time the Company hired Orin Lemin and whom Clock Electric should have hired instead.
 
 B. Photographing of Pickets
 
 35
 The second issue on appeal is whether the Company violated Section 8(a)(1) of the NLRA by taking a photograph of Orin Lemin while he picketed against Clock Electric at one of the Company's job sites. Section 7 of the NLRA gives employees the right "to self-organization, to form, join or assist labor organizations ... and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection ..." 29 U.S.C. § 157. Section 8(a)(1) of the NLRA gives effect to this right by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [their Section 7] rights ..." 29 U.S.C. § 158(a)(1). The test for determining whether an employer has violated Section 8(a)(1) is "whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." United Parcel Service v. N.L.R.B., 41 F.3d 1068, 1071-72 (6th Cir.1994)(citing N.L.R.B. v. Okun Bros. Shoe Store, Inc., 825 F.2d 102, 105 (6th Cir.1987), cert. denied, 485 U.S. 935, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988)). "In making this determination, the Board considers the total context in which the challenged conduct occurs and is justified in viewing the issue from the standpoint of its impact upon the employees." Id. (citations omitted).
 
 
 36
 It is well-settled Board law "that absent proper justification, the photographing of employees engaged in protected concerted activities violates the Act because it has a tendency to intimidate." F.W. Woolworth Co., 310 NLRB 1197, 310 NLRB No. 204, 143 L.R.R.M. (BNA) 1187 (N.L.R.B., Apr.27, 1993), (citing Waco, Inc., 273 N.L.R.B. 746, 747 (1984)). In F.W. Woolworth Co., after finding that there was no basis for the employer to have anticipated misconduct by employees who were engaged in handbilling, the Board stated,
 
 
 37
 [W]e adhere to the principle that photographing in the mere belief that "something 'might' happen does not justify Respondent's conduct when balanced against the tendency of that conduct to interfere with employees' right to engage in concerted activity."
 
 
 38
 F.W. Woolworth, Co., 310 N.L.R.B. No. 204, 143 L.R.R.M. (BNA) at 1188 (citing Flambeau Plastics Corp., 167 N.L.R.B. 735, 743 (1967), enfd. 401 F.2d 128, 136 (7th Cir.1968)). Accord NLRB v. Colonial Haven Nursing Home, 542 F.2d 691, 701 (7th Cir.1976) (concluding that "the Board may properly require a company to provide solid justification for its resort to anticipatory photographing"). While the Board found that "an employer's 'mere observation' of open, public union activity on or near its property does not constitute unlawful surveillance," when surveillance activity constitutes more than "mere observation," the employer's conduct violates the Act. F.W. Woolworth Co., 310 N.L.R.B. No. 204, 143 L.R.R.M. (BNA) at 1188. The Board held that "[p]hotographing and videotaping clearly constitute more than 'mere observation' because such pictorial recordkeeping tends to create fear among employees of future reprisals." Id. (citation omitted).
 
 
 39
 On or about July 15, 1994, Lemin's foreman took a photograph of Lemin holding a picket sign that read "Clock Electric Turns Back The Clock On Decent Wages And Benefits." Lemin was engaged in picketing at a site where Clock Electric was currently performing work. Although the Company seeks to justify its conduct by arguing that it had been subjected to unlawful picketing and secondary boycotts in the past and therefore instructed its foremen to take photographs to support its defense in potential subsequent litigation, there is no evidence that the picketing here was in any way unlawful. Indeed, when the order to take the photograph was given, the Company knew that it was Lemin, one of its own employees, who was picketing. F.W. Woolworth Co. rejected that an employer would be justified in photographing its employees in the mere belief that "something might happen." In this case, Clock was not justified in photographing its employee while that employee was engaged in picketing in the mere belief that the Company might be subject to a secondary boycott. Insofar as the Company wished to take a photograph for the purpose of identifying the type and lawfulness of the ongoing concerted activity, the Company may have been entitled to take a picture of the sign alone. There was no legal justification here for taking a picture of the individual holding it.
 
 
 40
 The Company also argues that it did not violate the Act by photographing Lemin because Lemin was a paid union organizer, and having his photograph taken on the picket line was more likely a "badge of honor" than intimidating. Moreover, the Company contends that Lemin did not in fact appear intimidated in the photograph. As observed by the ALJ, however, the Company cited no authority in support of either argument. The Company ignored that fact that Lemin was an "employee." Paid union organizers enjoy equal status as "employees" under Section 2(3) of the Act, N.L.R.B. v. Town & Country Elec., Inc., 516 U.S. 85, 98, 116 S.Ct. 450, 457, 133 L.Ed.2d 371 (1995). Because Lemin was an "employee," he was entitled to the protection of Section 8(a)(1) that prohibits unjustified anticipatory photographing.
 
 III.
 
 41
 Having carefully considered the record on appeal, the briefs of the parties, the arguments of counsel, and the applicable law, we GRANT the Company's petition and DENY the Board's cross-petition for enforcement of the Board's order insofar as it concluded that the Company discriminated on the basis of union membership when it hired Gelski. We GRANT enforcement, however, of the Board's order insofar as it determined that the Company violated Sections 8(a)(1) and (3) when it hired Lemin over Crumbley and Embrescia. We must therefore REMAND to the Board to determine how many positions were available after the Company lawfully hired Gelski and to which of the two applicants the Company should have offered employment. Finally, we GRANT enforcement of the Board's order insofar as it pertains to the unlawful photographing of a picket.
 
 
 42
 WELLFORD, Circuit Judge, concurring in part and dissenting in part.
 
 
 43
 I concur in the well-reasoned decision reversing the Board with respect to Clock Electric's hiring of Joseph Gelski for legitimate business reasons and not motivated by anti-union animus. I find it to be a very close question indeed on the conclusion that there were not sound and sufficient reasons, other than union considerations, for not hiring Crumbley as well as Embrescia.
 
 
 44
 However, I respectfully dissent as to the decision set out in Part IIB of Judge Kennedy's opinion that the single photograph of Orin Lemin, a strong union adherent, was a violation of § 8(a)(1) of the NLRA. To violate this provision, an employer must "interfere with, restrain, or coerce [an employee] in the exercise of [his] rights." 29 U.S.C. § 158(a)(1). Under the unquestioned circumstances of this case, I would find no interference, restraint, or coercion in the taking of a single picture of the picketing Orin Lemin carrying a sign with respect to the exercise of his rights. It is clear that Lemin understood his rights and had no hesitation in exercising his rights repeatedly in the presence of his employer. The activity involved was open and obvious to the public and to his employer at a common construction site. There was no recriminatory action such as discharge, immediate suspension, or warning as a consequence of Lemin's activity. He was not censured or threatened for having picketed. Furthermore, situs picketing in the construction industry does raise implications of a secondary boycott, a matter of longstanding past dispute between these parties. Thus, it is not beyond belief that the company was merely preparing its defense for possible future litigation.
 
 
 45
 The majority cites no case from this circuit involving this particular issue, much less a case involving the taking of a single photograph.[1] The Board cited two cases from this circuit, Larand Leisurelies, Inc. v. N.L.R.B., 523 F.2d 814 (6th Cir.1975), and N.L.R.B. v. Rybold Heater Co., 408 F.2d 888 (6th Cir.1969). Neither of these cases, in my view, involved remotely comparable facts and circumstances with respect to an employer's photographing actions. Larand Leisurelies involved multiple picture-taking over several days at the employer's store and the court made much of the fact that the photographs were not introduced into evidence in the proceedings before the Board or in court. Larand Leisurelies, 523 F.2d at 819. Rybold Heater Co. stated, in pertinent part: "The effect of Respondent's photographic exercises--often with unloaded cameras--was to scatter the pickets and halt their activities." Rybold Heater Co., 408 F.2d at 891. They "did interfere with protected activity." Id. (emphasis added).
 
 
 46
 The principal Board case relied upon, F.W. Woolworth Co., 310 N.L.R.B. 1197 (1993), was a divided opinion on this photographing-unfair labor practice question. It involved five photographs of "peaceful handbilling" at a Woolworth store. The majority in that decision makes reference to whether this activity "reasonably tends to interfere with" the exercise of employee rights. (emphasis added.) Many employees were pictured, and there was other interference by the employer with the handbilling. The Board considered whether there was "proper justification" for the employer's actions, and the majority concluded that the actions reasonably did relate to an atmosphere of potential fear, intimidation, or coercion with respect to the employees.
 
 
 47
 The dissenter in Woolworth, I believe, had it right that the photographing of employees in such activity as handbilling is "not per se unlawful," and that a tribunal should look to all the surrounding circumstances "to determine whether employees were coerced," citing U.S. Steel Corp. v. NLRB, 682 F.2d 98 (3d Cir.1982).
 
 
 48
 U.S. Steel Corp. involved two photographers taking a series of pictures at a demonstration of employees, a course which had been followed by the employer on prior occasions. The court considered whether the employer's actions "may reasonably tend" to bring about restraint or coercion or cause interference with employee rights, and concluded, under the circumstances (contrary to the Board), that they did not. Id. at 101, 103. There was certainly no per se violation, and the ALJ in that case found "no remedial order was warranted." Id. at 100. U.S. Steel Corp. indicated that in this type of unfair labor practice charge, the court should carefully consider the underlying circumstances on a case-by-case basis. Id. at 101. I am convinced that this is the proper course.
 
 
 49
 In the case now before us, I cannot conclude that the single action and episode involving the employer did "interfere with, restrain, or coerce" Lemin, or any other employee of Clock Electric. This single photograph did not reasonably tend to do any of these things. I find no other really comparable authority for the Board activity. I would therefore REVERSE the Board on this issue for the reasons indicated.
 
 
 50
 BOGGS, Circuit Judge, concurring in part and dissenting in part.
 
 
 51
 I concur in the court's opinion with respect to the photographing incident and with respect to the hiring of Lemin. However, I believe that the evidence that Clock would not have hired Gelski except for anti-union animus was sufficient and that, thus, the Board's ruling must be upheld.
 
 
 52
 The crucial problem with the court's opinion is shown by the variety of places in which it accurately recites the evidence as to the company's version of its hiring criteria. Thus, the opinion states at pages 11-12, "Clock testified that ... the company considers ...." and "Purportedly using these criteria, the Company made two discrete hiring decisions ...."; at page 13, it states, "[t]he remaining factors that Clock Electric claims to consider ...."; and at page 8, it declares that "[u]sing the factors that the company claims to consider ... the weight of the evidence establishes that it would have hired Gelski ...." (emphases added).
 
 
 53
 I do not disagree with any of these statements. Gelski may well have been a plausible candidate, or even the objectively preferred choice in our minds, or in the mind of a reasonable contractor. And I agree that the Board may not substitute its judgment for that of the employer as to the proper weight to give to factors such as job stability, recommendations from friends or customers, and wage history.
 
 
 54
 However, the proper inquiry here is whether Clock in fact would have made the same decision in the absence of anti-union animus. Given the ALJ's opportunity to weigh credibility, and the deference due to the Board's expertise in this area, I believe that the following evidence, which the court's opinion accurately recites, does constitute substantial evidence that Gelski's hiring was in fact motivated by anti-union animus.
 
 
 55
 * Clock did not at any time contact apparent union members for interviews, despite specific statements it made to the contrary.
 
 
 56
 * Clock did interview and accept inferior applicants such as Lemin, whom Clock believed (erroneously as it turned out) to be non-union.
 
 
 57
 * Clock specifically dissembled with respect to the degree of recommendation given to, and prior involvement with the company of, Gelski.
 
 
 58
 * Crumbley and Embrescia had several significant areas of their background in which they were more qualified than Gelski, especially training and prior experience.
 
 
 59
 When these matters are taken into account, there is substantial evidence that the decision to hire Gelski, even if he was objectively a plausible or even superior choice, was not in fact motivated by the considerations claimed by Clock, but rather by anti-union animus.
 
 
 60
 I therefore respectfully dissent with respect to the reversal of the Board's decision with regard to the hiring of Gelski.
 
 
 
 [1]
 The Union initially charged that Clock Electric's termination of Lemin constituted unlawful retaliation in response to Lemin's Union activity. The ALJ determined, however, that the Company discharged Lemin because of his entry into a restricted area at a customer site and his poor performance, particularly with respect to safety, during his probationary period. Because the Company had also fired other employees during their respective probationary periods, the ALJ found the evidence established that the Company would have discharged Lemin for the same reason in the absence of union affiliation
 
 
 [2]
 The circumstances of Gershen's application for employment are not before this court as the Board held that the Company articulated a legitimate reason for not hiring him. See infra n. 4
 
 
 [3]
 These three employees include Robert Dunfey, Robert Norfolk, and John Cronin. Dunfey had dropped out of the Union and was in business for himself when hired. Norfolk had not been a member of the Union for 10 years. Cronin expressed an interest in joining the Union's apprenticeship program to Chuck Clock in his interview, but at the time neither Cronin nor Clock believed this would happen given the difficulty of gaining admission to the program
 
 
 [4]
 In addition to these three candidates, at this time the Company also considered the May 25, 1994 application of overt union applicant Jerry Gershen. Gershen scored higher than any other applicant on the electrical test (17 out of 19) and had more training and experience than any other applicant. According to Lisa Clock, however, Gershen had an unkempt, dirty appearance, body odor, and his breath smelled of alcohol when he arrived to request an application. The Company maintains that it was concerned about Gershen because it frequently sends electricians out to perform work in offices and professional settings and did not want to run the risk of these clients taking offense at his appearance. Thus, Clock Electric opted not to contact Gershen for an interview. Because the Board concluded that the Company articulated a legitimate reason for not hiring Gershen, a reason that would have precluded his employment even in the absence of union affiliation, the Company's refusal to hire Gershen is not before us and our analysis here is limited to the Company's consideration of the remaining three applicants, Gelski, Crumbley, and Embrescia
 
 
 [5]
 Moreover, Gelski's application indicates that he worked continuously for one employer from 1989 to 1993. According to the information on Crumbley's and Embrescia's applications, neither individual worked for any one employer for more than two years
 
 
 [1]
 United Parcel Service v. N.L.R.B., 41 F.3d 1068 (6th Cir.1994), and N.L.R.B. v. Okun Bros. Shoe Store, Inc., 825 F.2d 102 (6th Cir.1987), involved § 8(a)(1) cases of threats, surveillance, and coercive tactics designed to interfere with employees' rights, not photographing activity